# Richmond

## J. W. WHITLOW v. COMMONWEALTH OF VIRGINIA.

March 4, 1946.

Record No. 3083.

Present, All the Justices.

The opinion states the case.

*J. Segar Gravatt*, for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. R. Doubles, Assistant Attorney General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

The defendant, J. W. Whitlow, stands charged with larceny and was convicted. He has applied to this court for and has been granted a writ of error.

C. H. Perkinson, the prosecuting witness, on February 16, 1945, swore out a warrant against him, in which he charged that Whitlow had unlawfully and feloniously stolen and carried away certain goods belonging to affiant. This case came on to be heard before the trial justice of Brunswick county on March 21, 1945. He was found guilty on March 27, 1945. No punishment was assessed against him, but he was sent on to the grand jury, and that grand jury on June 26, 1945, returned this indictment:

"The grand jurors of the Commonwealth of Virginia, in and for the body of the County of Brunswick, and now attending the said court at the June term, thereof, 1945, upon their oaths, present that J. W. Whitlow, within one (1) year last past, to-wit: on the . . . day of December, 1944, in the said county and within the jurisdiction of the said court.

Seven hundred (700) yards of canvas of the value
of Forty-five Dollars and fifty cents........... $ 45.50
Two (2) tons of hay of the value of one hundred
dollars ................................... 100.00
Ten (10) barrels of corn of the value of Eighty
dollars ................................... 80.00
One (1) 2-horse rake of the value of fifty-seven
dollars...................... 57.50
One (1) disk harrow of the value of sixty-five
dollars ................................... 65.00
One (1) spring-tooth harrow of the value of
twenty-nine dollars and fifty cents........... 29.50
Three (3) tobacco planters of the value of thirteen dollars and fifty cents.................. 13.50

of the aggregate value of three hundred and ninety-
one dollars................................... $391.00

of the goods and chattels of one, C. H. Perkinson, feloniously

did steal, take and carry away against the peace and dignity of the Commonwealth of Virginia.

A True Bill.

W. S. Peebles, Jr.

Foreman."

This case was by consent heard by the Judge without the intervention of a jury. He heard the evidence and entered this order:

"The court having heard the evidence, doth find the prisoner guilty, of embezzlement as charged in the indictment, and doth ascertain his punishment to be confinement in the State Penitentiary for a term of one (1) year."

The defendant then moved the court to set aside said judgment and enter judgment for him. Thereupon this additional order was entered:

" * * * for good cause shown the court doth suspend the execution of this sentence aforesaid during the good behavior of the said defendant upon condition that he do forthwith return to C. H. Perkinson, the hay rake, disc harrow and spring-tooth harrow in the indictment mentioned."

Since the court found the defendant guilty only of taking the hay rake, the disc harrow and the spring-tooth harrow, he was in substance found not guilty of taking the other articles mentioned in the indictment.

The defendant was a share-crop tenant. This is the compensation which, by custom, such tenants are entitled to receive:

"First: Where the tenant agrees to furnish his work and all team and necessary implements, the landlord furnishing only the land, the crop is customarily divided three-fourths to the tenant and one-fourth to the landlord.

"Second: Where the tenant agrees to furnish his work and the landlord furnishes both the land and all team and the necessary implements, the crop is divided one-half to the tenant and one-half to the landlord."

The original contract between these parties was made in December, 1939. Under it Whitlow was to furnish his work

and all team and necessary implements. The crop to be raised was to be divided three-fourths to him and one-fourth to his landlord. Whitlow then brought to the farm two mules, a wagon, 5 cultivators, 1 double shovel, 1 corn planter, 1 double plow, 3 single plows, and a number of hoes, rakes, briar blades, and all necessary harness. It then developed that there was a balance due on account of the purchase of these mules and this wagon and that their vendors were threatening to repossess them. If this were done, he told Perkinson that "he could not continue as a ¾ man, and asked him to buy in the mules for himself and furnish him with a wagon, and that he, Whitlow, would farm on a ½ basis." He then asked Perkinson to pay for him the balance due. This Perkinson was unwilling to do but bought in these mules and this wagon for himself and turned them over to Whitlow, together with a 2-horse rake, disk harrow and spring-tooth harrow to use.

It was then that a new contract was made under which they were to share and share alike, each taking one-half of the crop to be produced.

Whitlow continued to work under this new agreement for five years and left in December, 1944, taking with him his own farming implements, certain farm products, and the 2-horse rake, disk harrow and spring-tooth harrow, title to which is now in dispute.

On February 24, 1945, Perkinson wrote to Whitlow this letter:

"Mr. J. W. Whitlow,
"Kenbridge, Va.

"Dear William:

"Contrary to the advice of the Commonwealth Attorney of this county, I am writing to request that you bring or send here to my place at Smoky Ordinary, Va. the farming implements and other personal property you moved away from my 'Cincinnati Short' farm on which you lived last year belonging to me.

"Now this must be done not later than Thursday afternoon, five o'clock on March 1st, 1945.

"I wish to state for your information, I have a list of most of same and which you know about as well as I.

"I wrote you about this last Monday the 19th, addressing the letter to Dundas, Va. R. F. D. and have learned since that your correct address is Kenbridge instead of Dundas, Va.

"Yours very truly,

"CHP/J                                  C. H. Perkinson"

Whitlow replied on February 28, 1945, setting out his contention:

"Mr. C. H. Perkinson,

"Dear Sir:

"I have nothing that belong to you and can prove it at any time, for I do not do business that way, but you do have something that belong to me.

"You owe me ten *barls* of corn and some hay, and have mistreatment the work I did there on the place Jan 45, has not been paid yet and I have some guano and soda there and two wagon *frams* and my bell, and the reason I have not got them is you have refuse to let me have them, so up to now I have not said anything about them. And if you want to go to *Corte* about the matter, it will be all right, for I will be glad to get my side cleared up. And that will be the best way to do it. So any time I will be ready.

"Yours truly,

J. W. Whitlow,
Kenbridge, Va."

Perkinson's testimony, which is in narrative form, gives us his understanding of the second contract:

"He left the mules on the farm and sent a wagon up to the farm for Whitlow's use, and turned over to Whitlow

the 2-horse rake, disk harrow and spring-tooth harrow to use. That he did not tell Whitlow that he could have these implements as his own, but only turned them over for his use so long as he continued to farm the place. When asked what compensation Whitlow was to get for the use of his own implements, Mr. Perkinson replied that he was under the impression that he had bought all of Whitlow's implements and paid him for them, but that he could not remember definitely about this, and could not find among his records any proof of this, and that he, therefore, was not claiming all of the implements of Mr. Whitlow's, but only those mentioned in the indictment.

"Mr. Perkinson testified that neither he nor Whitlow had, at any time since 1939 or 1940, when they made their final agreement, discussed or mentioned the ownership of the farm implements, and that he had made no claim to them because he did not think it was necessary to claim that which he regarded as his own."

This is Whitlow's understanding of the situation:

He said "that several days later Mr. Perkinson came back and told him he had bought the two mules from Sheriff Valentine and would send him a wagon. That Whitlow thereupon asked Mr. Perkinson who the disk harrow, 2-horse rake and spring-tooth harrow belonged to (these implements being on the place at that time). That Mr. Perkinson replied that they were his,—he had bought them from Clint Lewis (C. L. Lewis).

"That he, Whitlow, then replied that he could use them and would like mighty well to have them. That Mr. Perkinson then told him that he would let him, Whitlow, have these implements for one year's use of the implements which Whitlow owned. That nothing further was ever said about these implements, except that on several occasions Mr. Perkinson made him an offer to buy his machinery, and in these negotiations he understood the disk harrow, spring-tooth harrow and rake were included as a part of his (Whitlow's) implements. That he, Whitlow, farmed there

for 5 years on ½ shares, and during this time furnished the machinery which he had brought to this farm."

The Commonwealth contends that these disputed implements were turned over by the landlord to the tenant, to be held by him in trust and that he is guilty of embezzlement. Code, section 4451.

Dealing with probabilities, since the tenant took only one-half of the crop, under common custom it was the landlord's duty to furnish all necessary implements. Most of the implements were actually furnished by the tenant. The landlord said that he was under the impression that he had paid the tenant for those furnished by him, but he had no evidence of it and permitted them to be taken away without objection. Moreover, it appears that during the tenancy the landlord offered to purchase those belonging to the tenant and his offer was not accepted. Those in dispute were taken away openly and without objection in December, and the landlord made no claim until February. It is true that the tenant did not list them for taxation, and it does not affirmatively appear that the landlord did; he owned several farms, and he listed his property thereon at the lump sum of $1600. There was nothing furtive about anything which the tenant did, and when the landlord made claim in February, he at once invited him to test out ownership in the courts.

This case turns upon intent; it must have been evil to sustain a conviction:

"As a general rule, however, where there is some evidence that the taking was under claim of right on the part of the accused, evidence that the property was taken openly, without any concealment or subsequent effort to conceal the taking, is evidence of good faith in the claim of right thereto and is frequently stated by the courts to be strong evidence or very powerful evidence thereof." 32 Am. Jur. 1049.

"We cannot first draw an evil intent from an act, and then enhance the evil of the act by adding this intent back again to it. There are a few cases which seem to overlook this truth, and even possibly to deny it; but it is sustained by

very nearly the entire mass of judicial authority, English and American." Bishop on Criminal Law, 9th Ed., Vol. 1, page 525.

There can be no embezzlement where the property is taken "under an honest belief that he (the accused) had a *bona fide* claim of right to do so."

*Wadley* v. *Commonwealth*, 98 Va. 803, 35 S. E. 452, deals with embezzlement and is instructive. Instruction No. 3 asked for reads:

"Before you can convict the prisoner under any count of the indictment against him you must believe beyond a reasonable doubt that he feloniously took, appropriated, disposed of, or converted to his own use the property, or some part thereof, therein mentioned—that is, that he did so with a criminal intent, and not under an honest belief that he had a *bona fide* claim of right to do so."

The court struck this from it as offered: "and not under an honest belief that he had a *bona fide* claim of right to do so," but we said:

"If there was evidence to support the instruction, as asked for, it should have been given. In embezzlement, there must be a fraudulent purpose to deprive the owner of his property and appropriate the same. If property is converted under a *bona fide* claim of right, the conversion is not embezzlement. If, therefore, upon another trial, there should be evidence tending to show that the prisoner acted under an honest belief that he had a *bona fide* claim of right, Instruction No. 3, as asked for, must be given."

There is no evidence of felonious taking, and it must appear beyond a reasonable doubt before there can be a conviction.

There is error also in the form of the judgment. He was sentenced to the penitentiary, but that sentence was suspended, provided he "forthwith return to C. H. Perkinson the hay rake, disc harrow and spring-tooth harrow in the indictment mentioned." A sentence of conviction may, in many cases, be suspended by the trial court, but it cannot be wiped away by restitution.

■ Where a tenant takes away property under a *bona fide* claim of ownership, title should be decided in a civil action.

For reasons stated, the judgment of conviction must be reversed and the case dismissed.

*Reversed and dismissed.*

HUDGINS, J., dissenting.

It seems to me that a restatement of the essential facts reveals the error in the reasoning and conclusions set forth in the majority opinion.

The express oral contract, under which the parties operated the farm for five years, was said by the accused to consist of an offer and an acceptance. The accused himself offered to cultivate the farm on a half share basis if the landlord would furnish him a team and a wagon. The landlord accepted this offer and furnished the team and the wagon. The landlord owned and turned over to the tenant, at his request, for use in the farming operations, one two-horse rake, one disk harrow and one spring-tooth harrow, all valued at $152. The agreement for the operation of the farm was renewed from year to year until January, 1945, when the accused left the premises and took with him the three pieces of farming machinery previously intrusted to his care, which he refused to return to the owner.

The fraudulent purpose—to deprive the owner of his property and to appropriate the same—may be inferred from the removal of the property from the premises and the refusal to return it, unless the circumstances disclosed that the property was taken under a *bona fide* claim of right.

The only evidence offered in support of the good faith of the accused is his own testimony. He stated that, when he first moved on this farm in 1939, he brought with him some second-hand plows, cultivators and hoes. He does not give the value of these farming implements, but he states

that the landlord sold him the three pieces of farming machinery, valued at $152, for one year's use of these second-hand implements.

This statement is not in accord with the terms of his agreement with the landlord or the subsequent conduct of the parties. Regardless of use or custom, the accused stated the terms of his employment as set forth above. The accused admitted that, in accordance with this contract, he delivered to the landlord one-half of the crops raised every year for a five-year period. He made no demand for compensation for the use of his farming implements, nor does he now claim compensation for use of such implements. He does claim that the landlord detained some of his property and that he had not been paid for work done in January, 1945, but he does not base his right and title to the three pieces of farm machinery in question on any obligation that he claims the landlord owed him. The basis of his claim of title to the three pieces of machinery in question is that he paid full value for them by one year's rental of other farming tools owned by him. The statement that any farmer of ordinary intelligence would agree to sell three pieces of farm machinery, valued at $152—and which were hard to get at any price during the war—for one year's use of a few second-hand plows and cultivators of uncertain and undetermined value strains my credulity to the breaking point, as it did the credulity of the trial judge.

The case presents positive affirmative testimony which, if believed, established the guilt of the accused beyond a reasonable doubt. To meet this testimony, the accused stated that he acted in good faith in the removal and retention of the property. This good faith was based upon a contract made between him and the landlord, the existence of which was denied by the landlord. The existence or non-existence of a fraudulent intent was a question of fact for the trial court. See *Shinn* v. *Commonwealth*, 32 Gratt. (73 Va.) 899; *Wadley* v. *Commonwealth*, 98 Va. 803, 35 S. E. 452; *Page* v. *Commonwealth*, 148 Va. 733, 138 S. E. 510.

We have consistently held heretofore that under such circumstances the verdict of a jury or the conclusion of the trier of fact was binding upon this court.

For these reasons, I think the conviction of the accused should be sustained.