**In re: Carl Gene DENSON, Debtor.**

**DETROIT AUTO BROKERAGE, INC., Plaintiff,**

v.

**Carl Gene DENSON, Defendant.**

**Bankruptcy No. 79–01768.**
**Adv. No. 80–0032.**

United States Bankruptcy Court,
E. D. Virginia.

Nov. 18, 1980.

Robert E. Henley, III, Martin, Meyer & Rothenberg, Richmond, Va., for plaintiff.

Harry M. Johnson, Jr., Richmond, Va., for defendant/debtor.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes on upon the filing of a Complaint by Detroit Auto Brokerage, Inc. alleging that the Debtor, Carl Gene Denson, obtained $2,144 from the Plaintiff by false pretenses and actual fraud or by embezzle-ment and requesting that pursuant to § 523(a)(2) and (4) of the Bankruptcy Code (11 U.S.C.) the debt of the Debtor be declared nondischargeable and that judgment be rendered against the Debtor in the sum of $2,144. The Defendant filed an Answer generally denying the allegations set forth in the Complaint. On July 10, 1980, a trial on the merits of the Complaint of Detroit Auto Brokerage, Inc. was conducted. Upon the foregoing, the Court renders the following opinion.

## STATEMENT OF THE FACTS

In October of 1978 Lee Raver formed Detroit Auto Brokerage, Inc. ("Company"), Plaintiff herein, as a brokerage for the sale of automobiles. Carl Denson, Defendant herein, was employed as the Company's sole salesman, receiving a draw of $400 twice a month plus 49% of the "profits" of the Company. In March of 1979 the Defendant's draw was raised to $1,000 per month in bi–monthly draws of $500. Lee Raver, president of the Company, received no draw or salary, but was to receive 51% of the "profits" of the Company. The fee arrangement with Denson was ambiguous. Denson testified that "profits" were gross profits while Raver indicated that "profits" were profits on the overall operation of the business exclusive of the personal entertainment expenses Raver charged to the Company. Further, Denson testified that his monthly draws were draws against commissions earned on each car sold while Raver stated these draws were draws against "profits" of the Company–not each individual car. In either event, these draws were advances against future earnings. Raver testified that he and Denson "were going to split the profits as they came in, and until the profits started coming in, I was going to pay him (Denson) so much per week on an advance basis".

It was the policy of Lee Raver to periodically sign a number of checks of the Company in blank to allow Denson to have a source of funds for the payment of expenses and for Denson's draws. In April and May of 1979, Carl Denson wrote a

series of ten checks payable to himself totalling $5,144. Of said amount, the Defendant was due $2,000 for his allowed draw for the months of April and May. One of the checks in the amount of $500 was a loan authorized by the Company by its agent, Lee Raver and is not in issue. Plaintiff has acknowledged the receipt of $500 from Denson which it applied against the excess draws of Denson resulting in $2,000 excess draws for the two months. [$144 has been determined to be legitimate expenses incurred by the Defendant and is no longer subject to dispute in this proceeding.]

The Defendant acknowledged that he had written the checks payable to himself and that he was exceeding his monthly draw. He stated, however, that he was entitled to this excess amount inasmuch as he had sold 17 automobiles and was due $1,963 in commissions. Further, Denson's uncontroverted testimony indicated that when Raver confronted Denson with the excess draws, Denson admitted he had overdrawn the account. Denson explained to Raver that he was entitled to this money inasmuch as Denson had "plenty of money on the books coming" for commission on cars already sold. According to Denson, again uncontroverted, Raver's response was that "if you [Denson] are selling cars, I don't care what you draw."

Marvin Phelps, a public accountant, testified that he kept the books of the Company from its inception and that the Company has incurred losses of approximately $30,000. It was Mr. Phelps who had informed Lee Raver concerning the excess draws of Denson. Lee Raver directed Phelps to treat those excess draws as loans in the Company records.

## CONCLUSIONS OF LAW

The Plaintiff alleges that under § 523(a)(2) or (4) of the Bankruptcy Code (11 U.S.C.) the debt of the Defendant is nondischargeable. The pertinent parts of § 523(a) read as follows: "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for obtaining money, property . . . by—(A) false pretenses, a false representation, or actual fraud . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ."

If the Plaintiff alleges actual fraud under § 523(a)(2)(A) or embezzlement under § 523(a)(4), the element of intent to commit those wrongs must be proven. Without intent, there can be no "actual fraud". "The fraud referred to in that section [§ 17(a)(4), now § 523(a)(4)] means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." 3 *Collier on Bankruptcy* ¶ 523.14[1][a] (15th ed.) quoting *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1887). "[S]ection 523(a)(2)(A) was intended to codify case law as expressed in *Neal v. Clark* which interpreted 'fraud' to mean actual or positive fraud rather than fraud implied by law." 3 *Collier on Bankruptcy* ¶ 523.08[5] (15th ed.) (footnotes omitted).

From the Company's inception, Denson's draws were advances against future earned commissions. The $5,144 drawn by Denson in April and May was admittedly over his scheduled draw; however, Denson believed he was entitled to this excess in that he had sold a number of cars and was due commissions on them in the amount of $1,963 by his last day of work, June 8, 1979. Further, he never concealed the fact that he was drawing money from the Company in excess of his scheduled amount. This fact is evidenced by the accountant's testimony that he determined that there were excess draws in reviewing the Company's checkbook stubs. The checkstubs were clearly marked as checks payable to Denson. The inconsistent testimony as to the actual profit sharing arrangement further clouds the issue of Denson's intent to appropriate money. Denson thought he was to receive a commission based upon gross profits. Raver thought he was to receive commission based upon net profits. Lee Raver's own testimony that he and Denson would "split the profits as they came in" further negates the element of intent to defraud

the Company, because it is not clear from the evidence as to when and what amount each party was entitled.

■ The Plaintiff must prove every element of the wrongdoing and this proof must be clear and convincing. *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1975). The burden of proof is clearly lacking.

Specifically as to the embezzlement aspect of Plaintiff's claim, *Whitlow v. Commonwealth*, 184 Va. 910, 37 S.E.2d 18, 21 (1946) holds that "[t]here can be no embezzlement where the property is taken 'under an honest belief that he (the accused) had a bona fide claim of right to do so'." Further, citing 32 Am.Jur. 1049, the court states:

"As a general rule, however, where there is some evidence that the taking was under claim of right on the part of the accused, evidence that the property was taken openly, without any concealment or subsequent effort to conceal the taking, is evidence of good faith in the claim of right thereto and is frequently stated by the courts to be strong evidence or very powerful evidence thereof." *Id.*

■ Denson does make such a "claim of right" to the money. Denson's uncontroverted testimony that he was entitled to $1,963 in commissions together with the fact that the fee arrangement with Raver was ambiguous prevents this Court from finding by clear and convincing evidence an intent to commit actual fraud or embezzlement from the Plaintiff.

It is the finding of this Court that the debt of the Debtor to the Plaintiff is dischargeable in bankruptcy.

An appropriate order will issue.