COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Willis and Annunziata
Argued at Richmond, Virginia


MICHAEL TAYLOR, S/K/A
 MICHAEL W. TAYLOR

                                    MEMORANDUM OPINION[*] BY
v.  Record No. 2474-96-2           JUDGE JAMES W. BENTON, JR.
                                      DECEMBER 16, 1997
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                  Oliver A. Pollard, Jr., Judge

          C. David Whaley (Anthony G. Spencer;
          Morchower, Luxton & Whaley, on brief), for
          appellant.

          Daniel J. Munroe, Assistant Attorney General
          (Richard Cullen, Attorney General, on brief),
          for appellee.


     Michael W. Taylor was convicted of grand larceny in

violation of Code § 18.2-95.  On appeal, he contends that the

evidence was insufficient to prove beyond a reasonable doubt that

he intended to take the property of another.  We agree and

reverse his conviction.

                              Facts

     On March 11, 1995, Long Manufacturing Company held an

absolute auction of its property because Long had ceased doing

business.  Deborah Loftis, the president of Long, testified that

prior to the auction, Long sold to Sudhaus of America eleven dies

that were used to make trunk locks.  Sudhaus purchased the dies

for $9,000 and their patents for $29,000.  During the auction,

---

[*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

the Sudhaus dies were on wooden pallets on the floor of the shipping and receiving building about fifteen to twenty feet from the shipping door.  Half the Sudhaus dies had yellow tags attached to them.

The auction company assigned a number to every piece of equipment and to every lot of items to be auctioned.  This number was marked with a chalk pencil on each piece of equipment.  Among the items sold at the auction were large numbers of various presses and dies.  Because the dies were on metal racks that had three or four shelves, with 50 to 60 dies on a rack, each rack of dies was assigned a lot number.  The rack was marked in chalk with this number and the dies on that rack were sold as a lot.  The individual dies were not marked.  The majority of the lots of dies being auctioned were located in the main building.  However, some dies were located in the shipping and receiving building, the same building where the Sudhaus dies were located.

During the auction, the auctioneer proceeded through each of three connected buildings selling equipment individually or by lot according to the assigned number.  Because the electricity was off in all of the buildings, the auctioneer would shine a flashlight on the equipment that was being sold.

Taylor, a self-employed scrap hauler, routinely went to auctions to purchase scrap metal and machines to sell to Peck's Recycling in Richmond.  At the auction, Taylor purchased for $900 four lots of dies and various presses weighing approximately nine

tons.  The dies Taylor purchased were located on racks of shelves in the tool shop building and the main building.

After the auction, the buyers had thirty days from the date of the auction to obtain their purchases.  Usually, Loftis would unlock the doors to the buildings and allow the buyers to retrieve the items they purchased.  Loftis testified that occasionally the buyers had to move equipment out of the way to get to their purchased items.  Because the buildings at the plant were connected, and the only loading area was in the shipping and receiving building, the majority of the buyers loaded their purchases through the doorway of that building.  Taylor loaded his items through that doorway using a forklift.

On April 11, Taylor and another scrap hauler, who had also purchased items at the auction, arrived at Long's premises to retrieve their property.  Taylor had retrieved many of his purchases on other occasions.  Loftis testified that very little property remained on the premises at that time and that she left the premises at 11:00 a.m. while the men were retrieving their property.  When Loftis returned at 3:00 p.m., Taylor and the other man were gone.  Loftis noticed that the Sudhaus dies were missing.

Loftis went to Peck's Recycling to look for the Sudhaus dies and saw several dies within mounds of other scrap metal.  On her first trip, she retrieved five or six dies from Peck's Recycling and took them back to the plant.  However, after she pulled the

dies apart and looked at them, she determined that not all of them were Sudhaus dies. Therefore, she returned three dies to Peck's. Loftis testified that the dies were not marked with the manufacturer's name. Thus, she had to open the dies before she was able to identify the Sudhaus dies. When she opened the dies, she was able to identify the Sudhaus dies because she had previously worked with those dies. In total, she recovered about half the Sudhaus dies. None of the dies she recovered from Peck's had yellow tags on them.

Taylor testified that he retrieved the majority of his property on the first or second day after the auction. He went to Long's several times and loaded his purchases onto a twenty-six foot truck. Taylor testified that when he returned on April 11, the thirtieth day, to get the balance of his property, many of the dies were moved, whole shelves were missing, and the dies had been pushed off the shelves and shoved onto the floor. He testified that he had to look around for his items, walking from one building to another to find them. Taylor also testified that most of the dies he purchased had to be transferred to wooden pallets for loading onto his truck because the racks could not be picked up with a forklift.

Taylor testified that he assumed the remaining dies were his because Loftis had said that all the other buyers had gotten their property. He loaded the dies that he thought were his and took them to Peck's Recycling. Taylor testified that no tags

were on any of the dies that he retrieved and that, if tags had been on the dies, they would have been noticeable. He loaded his dies onto his truck from the shipping and receiving building.

Taylor testified that when he learned at Peck's Recycling that someone wanted to speak with him about the dies, he called Loftis and left a message. According to Loftis, when she talked to Taylor, she told him that those dies did not belong to him and asked if he took them. Taylor told her that he took the dies to Peck's Recycling. When Loftis told Taylor that the police wanted to talk to him, Taylor asked for the name and phone number of the investigating officer. Taylor called the officer. When the officer said that Taylor had taken the dies, Taylor responded, "Well, I'm sorry. I thought they were mine. I'll do what I can to get them back." Taylor then went to Peck's Recycling, offered a reward if Peck's could find the dies, and told them he would repurchase the dies.

Taylor was arrested on April 14. After his arrest, Taylor told the investigating detective that he took the dies that were found at Peck's Recycling. Taylor said that he had purchased dies and thought the dies he took were his. He also stated that he had purchased a number of dies and that he was not sure if the dies he took from Long's premises were his or not. Taylor said that the dies he took were in the same area where his dies were stored. When the detective explained that the dies Taylor took were stored in a different area, Taylor stated that he took the

dies from "out front where the loading dock was."

The trial judge found that the Sudhaus dies were marked for delivery and Taylor knew they were not his dies. Based on those findings, the judge convicted Taylor.

Sufficiency of the Evidence

Larceny is "the wrongful or fraudulent taking of personal goods of some intrinsic value, belonging to another, without his assent, and with the intention to deprive the owner thereof permanently." Skeeter v. Commonwealth, 217 Va. 722, 725, 232 S.E.2d 756, 758 (1977). "In determining intent, 'the fact finder may consider the conduct of the person involved and all the circumstances revealed by the evidence.'" Welch v. Commonwealth, 15 Va. App. 518, 524, 425 S.E.2d 101, 105-06 (1992) (citation omitted). As in all criminal cases, the Commonwealth must prove beyond a reasonable doubt each element of the offense. Jones v. Commonwealth, 3 Va. App. 295, 299, 349 S.E.2d 414, 417 (1986).

Equally well established is the principle that "[e]vidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture. The evidence must be such that it excludes every reasonable hypothesis of innocence." Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977). "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the

level of proof beyond a reasonable doubt." Littlejohn v. Commonwealth, 24 Va. App. 401, 414, 482 S.E.2d 853, 859 (1997) (citation omitted).

The evidence, viewed in the light most favorable to the Commonwealth, Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975), failed to prove beyond a reasonable doubt that Taylor had the requisite criminal intent to take the property of another. It does not exclude the reasonable hypothesis that Taylor took the dies because he believed that he had purchased them at the auction and that the dies belonged to him.

The evidence proved that over a period of thirty days after the auction, buyers had been going to the plant to retrieve their purchases, moving equipment and property aside, and loading their items at the shipping and receiving building. Not all items were in the same places in which they were located during the auction. Loftis testified that on April 11, there were very few items left in the buildings. When Taylor returned on April 11 to retrieve the balance of his property, the dies he had purchased were no longer neatly stacked on metal racks marked by lot numbers. They were shoved on the floor and racks were missing.

The evidence proved that the Sudhaus dies were not all individually tagged. Loftis admitted that about half of the eleven Sudhaus dies were not tagged, and she testified that both the tagged and untagged Sudhaus dies were sitting on a pallet in

the shipping and receiving department.[1]  However, during the auction, other dies had been sold in lots from racks located in that building.  No evidence tended to prove that Taylor would have known that the untagged dies were not his when he walked through each of the buildings to find his property.

The Sudhaus dies also could not be easily identified on sight.  Loftis, who had worked with the Sudhaus dies for several years, could not distinguish the Sudhaus dies from other dies until she pulled the dies apart.  Indeed, when Loftis retrieved dies from Peck's Recycling where Taylor sold his dies, none of the dies Loftis recovered had tags on them.  She could not determine whether they were the Sudhaus dies until she opened them at Long's.

Taylor told the police that he had purchased several lots of dies, and, while he thought the remaining dies were his, he wasn't certain.  Indeed, Taylor had been told that all the other buyers had retrieved their property.  Because his dies were not where he had left them, much of the auctioned property had been moved, and at least half of the Sudhaus dies were not tagged, Taylor could have reasonably assumed that the remaining dies located near the loading area, including the untagged Sudhaus dies, were his.

---

[1]Although Loftis first testified that she personally attached yellow tags to each of the Sudhaus dies, she later testified that she had only put tags on about half of the dies. She stated that she had attached the tags at the end of February and had checked the tags the morning of April 11.

If property is taken "under a <u>bona fide</u> claim of right, as under a claim of ownership," criminal intent is lacking and there can be no larceny. <u>Pierce v. Commonwealth</u>, 205 Va. 528, 533, 138 S.E.2d 28, 32 (1964); <u>See</u> <u>Butts v. Commonwealth</u>, 145 Va. 800, 813, 133 S.E. 764, 768 (1926). "'[W]here there is some evidence that the taking was under claim of right on the part of the accused, evidence that the property was taken openly, without any concealment or subsequent effort to conceal the taking, is evidence of good faith in the claim of right.'" <u>Whitlow v. Commonwealth</u>, 184 Va. 910, 917, 37 S.E.2d 18, 21 (1946) (citation omitted).

Based on this evidence, we cannot say that the Commonwealth excluded the reasonable hypothesis that Taylor took the unmarked Sudhaus dies because he believed they were his. From the evidence in this record, the trier of fact would have to speculate that Taylor took the Sudhaus dies that were marked. No evidence proved that Taylor did. They were not located at Peck's Recycling. Furthermore, the Commonwealth did not prove beyond a reasonable doubt that Taylor had the requisite criminal intent to take the property of another. Rather, the evidence tends to prove that Taylor had a good faith, although mistaken, claim of right to the property. Therefore, we reverse his conviction and dismiss the indictment.

<u>Reversed and dismissed.</u>

- 9 -