COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Overton
Argued at Richmond, Virginia


MONIQUE LITTLEJOHN
                                         OPINION BY
v.  Record No. 1834-95-2        JUDGE JAMES W. BENTON, JR.
                                      MARCH 18, 1997
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Robert W. Duling, Judge

          Kevin M. Schork (Epperly, Follis & Schork,
          P.C., on brief), for appellant.

          Katherine P. Baldwin, Assistant Attorney
          General (James S. Gilmore, III, Attorney
          General, on brief), for appellee.


     A jury convicted Monique Littlejohn of (1) one charge of

being an accessory before the fact to capital murder, (2) four

charges of being an accessory before the fact to first degree

murder, (3) two charges of being an accessory before the fact to

malicious wounding, and (4) seven charges of being an accessory

before the fact to the use of a firearm in the commission of a

felony.  This Court granted Littlejohn's appeal on the issues

whether the trial judge abused his discretion when he denied

Littlejohn's motion for a change in venue and whether the

evidence was sufficient to uphold the convictions.  Because the

evidence was insufficient, we reverse the convictions.

                              I.

     The evidence proved that at approximately 9:30 a.m. on

October 14, 1994, police officers from the City of Richmond went

to 1008 St. James Street, Apartment C, in response to a report of multiple shootings. Tamika Jones, a minor, had reported to the police by telephone that Christopher Goins had shot her and her family. Inside the apartment, the police found two adults and three children dead from multiple gunshot wounds. The officers also found three baggies of powder and crack cocaine on James Randolph, Jones' deceased father, and later learned that Daphne Jones, Jones' deceased mother, had cocaine in her blood. Jones and one of her infant siblings had been shot but were alive. Littlejohn was indicted on fourteen charges of being an accessory before the fact to Goins' commission of these crimes.

At trial, Jones testified that Goins often visited her mother and stayed overnight at their apartment with her mother. Although Jones and her parents knew that Goins sold illegal drugs, Goins and the Jones family members trusted each other. Jones also testified that at one point she wanted to leave home and live with an aunt because of all the drug dealing that occurred in her family's apartment. Jones testified, however, that she developed a close relationship with Goins and on one occasion kept for him $2,400 of proceeds from his drug business.

Three years after Jones met Goins, she began having a sexual relationship with Goins. She was then twelve years old. She testified that she became pregnant by Goins in March 1994, when she was fourteen years old. Jones testified that although Goins was pleased that she was pregnant, when she told Goins that she

did not wish to deliver the baby, Goins said he would abide by her wishes. However, Goins did not give her money for an abortion as he had promised.

Devon Hicks, Jones' teenage friend, testified that Jones had confided only in him that she and Goins were sex partners. Hicks also testified that Jones hid that fact from her mother. No evidence established whether Jones' mother knew that Goins was the person who had impregnated her daughter.

Jones learned in 1993 that Littlejohn also had a sexual relationship with Goins. Littlejohn also had become pregnant by Goins during the same time period as Jones. In June 1994, however, Littlejohn underwent an emergency abortion due to a complication with her pregnancy. That same month, Jones' friends told Jones that Littlejohn had asked them to beat Jones in order to cause Jones to abort her baby. When Jones confronted Littlejohn about these allegations, Littlejohn admitted that they were true and said that she made the statements only because she was upset. Later in June, Jones overheard Littlejohn threaten to use a knife to "cut the baby out" of Jones. Littlejohn told Jones that if Littlejohn could not have Goins' baby, then neither could Jones.

Jones also testified that Littlejohn never hit her or shoved her and that Littlejohn made no threats against her after June 1994. Indeed, when Jones was in the hospital at various times between July and early October because of her pregnancy,

- 3 -

Littlejohn visited Jones several times. Littlejohn, who worked at the hospital where Jones was receiving treatment, spent free time in Jones' room and on occasion asked if Jones needed things that Littlejohn could deliver to her. Although Littlejohn acted as a friend and their dispute seemed to have subsided, Jones did not believe Littlejohn was sincere. On October 11, 1994, Littlejohn visited Jones in her hospital room several times during Littlejohn's work breaks. She told Jones that Goins "didn't want anything to do with the baby" and that on October 14 she and Goins planned to go to New York, where Goins' ill father lived, to start a new life. She said Jones needed to find someone to love her and help her take care of her child.

Hicks, Jones' teenage friend who lived across from Jones' apartment, testified that on the morning of October 14, between 8:00 a.m. and 8:30 a.m., he saw Goins and Stefan Winston on the porch leading to Jones' apartment. He also saw Barry Scott at Jones' door. Hicks, who knew Winston was involved in drugs, told Winston that Hicks' brother wanted to see Winston. Hicks then returned to his apartment and prepared for school. When Hicks was leaving for school, Jones called to him from her window and urged him to go to school. At that time, Goins was talking to one of Hicks' schoolmates and asked her if she wanted a ride to school.

Sherwyn Green testified that at 8:30 a.m. on the morning of October 14, he drove a friend, who was a cocaine dealer, to the

Jones' apartment. The cocaine dealer intended to sell cocaine to people in the apartment. When Green and the cocaine dealer arrived at the street in front of the apartment, they saw Goins and Winston talking outside the Jones' apartment building. Green testified that he and the cocaine dealer did not leave Green's car. Instead, they "wait[ed] for [Goins and Winston] to leave because [the cocaine dealer] didn't want to go up there while [Goins] was going up there because it would create a conflict." Green feared a conflict because his friend, the cocaine dealer, and Goins "both . . . were trying to sell drugs" to people in Jones' apartment. Green had been in Jones' apartment previously when his friend, the cocaine dealer, sold cocaine there. While Green and the cocaine dealer waited in Green's automobile, Goins went inside Jones' apartment. After Goins stayed in the apartment for a while and Winston remained outside, Green and the cocaine dealer drove to a nearby store three blocks away.

Jones testified that on the morning of October 14, between 6:00 a.m. and 9:00 a.m., Barry Scott entered the apartment and visited her family. Scott entered the bedroom where Jones was playing with her four infant siblings. Scott talked to her and looked at the ultrasound "picture" that she had obtained while in the hospital. Scott left the apartment but returned ten minutes later with Goins. While Goins was in the apartment, Scott returned to the bedroom where Jones was and obtained the ultrasound "picture." He took the ultrasound "picture" into the

living room and showed it to Goins. Goins responded, "I don't want to see that. Take it back to her. Why are you showing me that . . . ?" When Scott returned the ultrasound "picture" to Jones, she admonished him for showing it to Goins and said, "I didn't want him to see it."

In the ensuing thirty or forty minutes, Jones heard her mother, her father, Scott, and Goins talking and laughing in the living room. When Jones went to the bathroom, she saw Goins sitting on the sofa. Although she made eye contact with Goins, they did not speak. Jones returned to her bedroom and heard more talking and laughing for fifteen minutes. Then she "started hearing shots." She heard her brother crying, her mother scream, shots, and footsteps of one person walking to the bedrooms. She then saw Goins standing at the door with a gun. After Goins shot her multiple times, she did not hear anything. Jones testified that she remained still and pretended to be dead. After a while, she got up and called the police.

Green testified that after he and the cocaine dealer drove to the nearby store, they made calls on the telephone. They also purchased sandwiches and waited for calls to be returned to them. While they were waiting, Green saw Littlejohn arrive in her automobile. As Littlejohn sat in the automobile, they observed Winston walking along Baker Street. Shortly thereafter, Goins arrived, walking along another street. Goins spoke to Winston and then entered Littlejohn's automobile. Littlejohn drove away

with Goins as her passenger. Winston walked away.

The police met Littlejohn while she was on her way to work on the afternoon of October 14. When the police told her of the shootings, Littlejohn went with the police for questioning. Littlejohn falsely told the police that she had not seen Goins that day, that she had recently moved to get away from Goins, and that Goins did not know where she lived. When the police searched Littlejohn's apartment, with her permission, they found men's clothing and various handgun publications, including a manual for the operation of a Glock .45 caliber automatic. The police also saw a safe, which Littlejohn falsely told them was in the apartment before she began her occupancy. Later, the police found inside the safe Littlejohn's social security card, birth certificate, car title, and an identification card bearing a photograph of Goins with the name, "Derrick Readon," an alias used by Goins. Upon searching Littlejohn's car, the police found Littlejohn's driver's license and another identification card bearing a photograph of Goins with the name, "Derrick Readon." After the police questioned Littlejohn, they released her.

A few days later, after Littlejohn's apartment had already been searched by the police, Littlejohn's mother found a .45 caliber cartridge underneath Littlejohn's bed and informed the police. Firearms experts concluded that the unspent cartridge had been loaded at some time into the same magazine that had held the bullets used to kill Jones' family. The evidence proved that

Jones and the people in the apartment had all been shot with .45 caliber ammunition shot from a gun of a type made only by Glock.

On November 17, 1994, Littlejohn and Goins were arrested in New York. At that time, Littlejohn was charged with obtaining a drug without a prescription, a charge unrelated to this case.

Renita Phifer testified that she was incarcerated in the same prison in New York with Littlejohn. She talked with Littlejohn after Littlejohn learned in a telephone conversation that "Barry" talked to the police about Goins and Littlejohn. Phifer said Littlejohn became upset and confided in her. She testified that Littlejohn said "they were really out to get her." She also testified that Littlejohn told her that the police had found a gun which had been discarded and that Littlejohn was worried because she did not know if her fingerprints were on the gun. She further testified that Littlejohn told her "Barry" said that Goins had killed people and that Littlejohn "knew about it." Phifer testified that Littlejohn said that there were rumors that she had threatened Jones and her family. When she asked Littlejohn if the rumors were true, Littlejohn "smirk[ed]" and nodded affirmatively.

Phifer testified that Littlejohn was angry about the "other girl" and had several "run-ins" with her because the girl was "saying she was carrying [Littlejohn's] 'husband's' baby." Phifer testified that Littlejohn said that she had waited in her car parked near the Jones' apartment for Goins on October 14, and

that she and Goins left together.  Phifer also testified that Littlejohn said "one little mistake had ruined her whole life." Phifer did not know the nature of Littlejohn's "mistake."

At the close of the Commonwealth's case, Littlejohn moved to strike the evidence on the ground that no proof of a plan or shared intent had been established.  The trial judge denied the motion.  The jury convicted Littlejohn of all of the charges against her.  The trial judge imposed the jury's recommended sentence of one hundred and eighty-eight years, and the judge suspended ten years.

## II.

Before trial, the trial judge denied Littlejohn's motion for a change in venue.  This Court granted Littlejohn's petition for appeal on this issue.  However, Littlejohn failed to submit a written argument on the issue in her brief.  That issue was therefore waived.  See Rule 5A:20(c); Roach v. Commonwealth, 251 Va. 324, 335, 468 S.E.2d 98, 104, cert. denied, ___ U.S. ___, 117 S. Ct. 365, 136 L. Ed. 2d 256 (1996).

## III.

Littlejohn argues that the evidence was insufficient to prove beyond a reasonable doubt that she was an accessory before the fact to the charged offenses.  We agree.

An accessory before the fact "is one not present at the commission of the offense, but who is in some way concerned therein, . . . before[hand] . . . , as [a] contriver, instigator

or adviser."  Hitt v. Commonwealth, 131 Va. 752, 759, 109 S.E.
597, 600 (1921).

> This definition mandates that in the trial of
> an accessory before the fact the Commonwealth
> establish the following elements beyond a
> reasonable doubt:  the commission of the
> crime by the principal, the accessory's
> absence at the commission of the offense, and
> that before the commission of the crime, the
> accessory was "in some way concerned therein
> . . . as [a] contriver, instigator or
> advisor."

McGhee v. Commonwealth, 221 Va. 422, 425-26, 270 S.E.2d 729, 731
(1980) (citations and footnotes omitted).

The Commonwealth, therefore, must prove beyond a reasonable
doubt that "the accused . . . either [knew] or [had] reason to
know of the principal's criminal intention and . . . [that the
accused] intend[ed] to encourage, incite, or aid the principal's
commission of the crime."  Id. at 427, 270 S.E.2d at 732.
Although the Commonwealth may meet its burden of proof through
circumstantial evidence, see Dickerson v. City of Richmond, 2 Va.
App. 473, 477, 346 S.E.2d 333, 335 (1986), "[u]nder familiar
principles, such proof is insufficient if it creates merely a
suspicion of guilt; the . . . evidence must be consistent with
guilt and exclude every reasonable hypothesis that the accused is
innocent of the charged offense."  Id.

Viewed in the light most favorable to the Commonwealth, the
evidence proved that Littlejohn was angry with Jones because
Jones was pregnant with Goins' child and that Littlejohn had
threatened to harm Jones four months before the murders.

Although the evidence proved that Littlejohn harbored animosity toward Jones four months before the murders, no evidence linked that animosity to Goins' killing of five people in the apartment or his shooting of Jones and her sibling. No evidence proved that Littlejohn was with Goins and Scott before they went to the apartment. Furthermore, no evidence proved that Littlejohn knew beforehand that Goins intended to kill or shoot the people in the apartment. The fact that Littlejohn had animosity toward Jones does not, without more, permit an inference that, before the fact, she contrived, instigated, or advised in Goins' rampage in the apartment. Indeed, no evidence in this record proved that when Goins entered the apartment he did so with the intent to commit murder.

Unlike McGhee, where the evidence proved that the accused repeatedly encouraged the assailant to commit the murders, see 221 Va. at 427-28, 270 S.E.2d at 733, here no such facts were proved. The evidence that Littlejohn was angry with Jones four months before the murders does not support an inference, beyond a reasonable doubt, that Littlejohn encouraged Goins to commit murder, that she knew of Goins' intention when he entered the apartment, or that Littlejohn intended to aid in Goins' commission of the murders.

Other evidence at trial proved that after Goins went into the apartment, Littlejohn arrived at a store three blocks away from the apartment and waited for Goins in her automobile.

- 11 -

Although the jury could have reasonably concluded that Littlejohn was waiting at the store for Goins to arrive, no evidence proved and no inference arises from the evidence that Littlejohn knew that Goins was in the Jones' apartment, that Goins went there intending to kill anyone, or that Littlejohn's presence at the store was for the purpose of aiding him in so doing.  See Moehring v. Commonwealth, 223 Va. 564, 568, 290 S.E.2d 891, 892 (1982) ("Under such circumstances, it is difficult to regard [her] as a 'lookout,' or an accessory before the fact.").  The jury had no evidentiary basis to infer that Littlejohn knew that Goins would commit murder before he met her.  The evidence does not exclude the hypothesis that Littlejohn was waiting for Goins after having agreed merely to meet him at that time and place. "'[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused].'"  Corbett v. Commonwealth, 210 Va. 304, 307, 171 S.E.2d 251, 253 (1969) (citation omitted).

Other evidence adduced at trial, but which does not prove Littlejohn's involvement before the crimes were committed, was the evidence that when the police questioned Littlejohn after the murders and informed her of Goins' involvement, Littlejohn lied concerning her relationship with Goins.  However, "such suspicious conduct does not constitute evidence sufficient to support a finding of guilt beyond a reasonable doubt."  Bishop v.

Commonwealth, 227 Va. 164, 170, 313 S.E.2d 390, 393 (1984).

> "The giving by the accused of an unclear or unreasonable or false explanation of his conduct or account of his doings are matters for the jury to consider, but they do not shift from the Commonwealth the ultimate burden of proving by the facts or the circumstances, or both, that beyond all reasonable doubt the defendant committed the crime charged against him."

Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977) (citation omitted).

Although the police found in Littlejohn's apartment an unused cartridge matching the bullets used in the murders and a manual describing the operation of a gun similar to the one used in the murders, that proof only engenders a suspicion. Likewise, the evidence proved that Littlejohn talked to Phifer about events that occurred _after_ the murders. None of these circumstances proved or supported an inference that _before_ the murders, Littlejohn knew that Goins intended to commit the murders or in any way aided, encouraged, or incited him to do so.

Moreover, the evidence did not exclude the hypothesis that Goins committed the murders for reasons completely unrelated to Littlejohn. See McGhee, 221 Va. at 427, 270 S.E.2d at 732 ("The evidence must . . . establish that the accessory before the fact shared the criminal intent of the principal."). In fact, no evidence in this record proved the catalyst for the shootings. The evidence proved that before Goins went to the Jones' apartment, in a neighborhood where he was well known, he was

openly socializing with Scott and Winston on the street in front of the apartment.  He also talked with a teenage girl.  No evidence tended to prove that he sought to hide his presence at the apartment or was concerned about being seen there.  Thus, evidence exists that supports a reasonable inference that the murders were not planned in advance of Goins' arrival in the Jones' apartment.

Moreover, the evidence raises the possibility that something that occurred in the apartment caused Goins to react spontaneously.  The evidence proved that after Goins entered the apartment, he was laughing and talking with Jones' parents.  The evidence proved that in the past Goins sold illegal drugs to Jones' mother and was known as a drug dealer by people in and around the low income housing complex where the Joneses lived.  Goins often stayed overnight in the Jones' apartment, a place where drug activity occurred.  The evidence also proved that when Goins murdered the Jones family, Jones' mother had cocaine in her body and Jones' father had three bags of cocaine on his person.  Furthermore, the evidence proved that while Goins was in the apartment, another cocaine dealer was in the vicinity of the Jones' apartment waiting for Goins to leave so that he could sell cocaine to Jones' parents without creating a conflict with Goins.  The evidence proved that this other cocaine dealer, tired of waiting, went three blocks away to a store, made telephone calls, and received messages on a pager while Goins was in the

apartment.  The conclusion is inescapable that drug activity was inexorably linked to the events that occurred in the apartment.

The evidence also established that Goins became perturbed in the apartment when his friend showed him an ultrasound picture of Jones' fetus.  Evidence in the record also proved that Jones had attempted to hide from her mother her sexual relationship with Goins.  Indeed, Jones did not testify whether she had informed her parents that Goins had impregnated her.  The evidence did prove that when Goins and Jones saw each other, they did not speak.  Thus, the evidence raises the possibility that Goins went on a rampage as a result of being confronted with the ultrasound "picture."  The evidence also proved, however, that after Goins saw the ultrasound "picture" Goins continued laughing and talking with Jones' parents for almost an hour before he began shooting the people in the apartment.

Simply put, the evidence in this record fails to establish why Goins went on his murderous rampage.  The record leaves that to speculation, including the possibility that he planned the murders before he entered the apartment.

Because no direct evidence tends to prove that Littlejohn knew that Goins intended to commit the murders and the shootings and that she encouraged him, the Commonwealth argues that the jury could have inferred that whatever the catalyst for Goins' actions may have been, Littlejohn had prior knowledge and shared his intent because of her animosity toward Jones.  However, that

inference could only have arisen if the jury "engage[d] in speculation and conjecture." Wright v. Commonwealth, 217 Va. 669, 670, 232 S.E.2d 733, 734 (1977).

> "[E]vidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture. The evidence must be such that it excludes every reasonable hypothesis of innocence."

Hyde, 217 Va. at 955, 234 S.E.2d at 78 (citation omitted). When, from the circumstantial evidence, "it is just as likely, if not more likely," that a "reasonable hypothesis of innocence" explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt. Haywood v. Commonwealth, 20 Va. App. 562, 567-68, 458 S.E.2d 606, 609 (1995).

In summary, nothing about Littlejohn's conduct provides a basis from which the jury could have inferred beyond a reasonable doubt that, before Goins committed the murders, Littlejohn shared in Goins' intent. No evidence proved or tended to prove that Littlejohn knew Goins' whereabouts or purposes prior to meeting him. Most critically, no evidence was admitted from which the jury could have drawn an inference, to the exclusion of an equally reasonable contrary inference, that Littlejohn knew Goins was going to commit the murders or that she intended to assist Goins in committing the murders.

In addition, the evidence proved that Goins was known as a drug dealer, that his relationship with the adults in the

apartment was tied to his drug dealing, and that drugs were found on and in the bodies of the dead adults. The evidence also proved that another seller of cocaine was outside the apartment and dared not enter lest he and Goins met and had a conflict. Thus, the evidence also did not exclude the hypothesis that the killings and Goins' motive were drug related, unknown to Littlejohn, and completely unrelated to her attitude toward Jones.

Therefore, the evidence failed to prove beyond a reasonable doubt that Littlejohn "share[d] the criminal intent of the principal." McGhee, 221 Va. at 427, 270 S.E.2d at 732. Suspicion, no matter how strong, is not enough. See Bishop, 227 Va. at 170, 313 S.E.2d at 393. Convictions cannot rest upon speculation and conjecture. See Smith v. Commonwealth, 192 Va. 453, 461, 65 S.E.2d 528, 533 (1951). Accordingly, we reverse the convictions.

Reversed.