COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick,[*] Judge Elder and
          Senior Judge Duff
Argued at Alexandria, Virginia


CASSONDRA SUE BETANCOURT
                                          OPINION BY
v.      Record No. 0864-96-4   CHIEF JUDGE JOHANNA L. FITZPATRICK
                                       JANUARY 20, 1998
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                      James H. Chamblin, Judge

          Paul A. Morrison for appellant.

          Daniel J. Munroe, Assistant Attorney General
          (Richard Cullen, Attorney General;
          H. Elizabeth Shaffer, Assistant Attorney
          General, on brief), for appellee.


     Cassondra Sue Betancourt (appellant) was convicted in a jury

trial of first degree murder in violation of Code § 18.2-32.  The

court accepted the jury's recommendation and sentenced her to

fifty years in prison.  On appeal, appellant argues that:  (1)

the evidence was insufficient as a matter of law to convict her

of first degree murder; (2) the court erred in admitting tapes

and transcripts in violation of the best evidence rule; and (3)

the court erred in denying appellant's motion for a mistrial.

Finding the evidence insufficient, we reverse the conviction.

Because we reverse on this ground, we do not address appellant's

other contentions.

---

[*]On November 19, 1997, Judge Fitzpatrick succeeded Judge
Moon as chief judge.

On appeal, the sufficiency of the evidence must be examined in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. See Sam v. Commonwealth, 13 Va. App. 312, 411 S.E.2d 832 (1991). "The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." Id. at 318, 411 S.E.2d at 835.

Cassondra Betancourt had a three-year relationship with Walter Montague (the deceased), which included business dealings, sharing a bed on at least one occasion, and frequent cocaine use. Montague was an overweight sixty-five-year-old smoker who habitually used drugs and alcohol.

In the spring of 1994, appellant and Montague agreed to start a business. They obtained a tax identification number from the IRS and began incorporation proceedings. As part of this business relationship, appellant and Montague took out a "key man" life insurance policy on Montague. Appellant was the beneficiary of the policy. On August 3, 1994, Frank Dennis, a Nationwide Insurance Company agent, completed the application for a $500,000 policy. Appellant and Montague made an initial payment of $2,130 with a check drawn on appellant's account. Dennis testified that this payment was necessary for the beneficiary to collect should the insured die during the application period. Montague was required to undergo a medical

examination before the policy could be finalized.  Appellant discussed with Montague the need to complete the process and repeatedly encouraged him to have the exam so the policy would become effective.  Montague failed to have the required medical examination before he died on August 11, 1994.

On August 11, 1994, appellant purchased approximately ten grams of powder cocaine from Kip Rice for $600.  Appellant indicated that she wanted the cocaine for a trip out of town with some friends.  Rice warned appellant to be careful with the cocaine because it was powerful.

On the same day, Montague bought two bottles of liquor and registered for a room at the Hampton Inn Hotel in Sterling, Virginia.  It was Montague's custom to stay in hotels when he "wanted to party."  When Montague checked into the hotel, he paid for two people, and at some time he left a note indicating that he had "gone to [the] gas station [and would] be right back."  Over the course of the day, he made numerous phone calls, including at least six calls to appellant, asking her to meet him at the hotel.  Montague also phoned his stepdaughter, Dixie, but she declined his dinner invitation.  Janet Hall, Montague's adopted daughter, spoke with him at 4:00 p.m. and again at 6:30 p.m.  During the 6:30 p.m. conversation, Hall heard appellant in the background, and Montague explained that he was having dinner with her.

Appellant joined Montague at the hotel in the evening, and

3

they played cards and discussed various aspects of their relationship. They also drank fireballs, a mixture of cinnamon schnapps and tabasco sauce. Appellant told police that the discussion resulted in a disagreement, and she left, telling Montague that their relationship would be limited to business in the future.

Janet Hall tried to reach Montague several times that evening, but he failed to answer his pager and the room phone rang busy after 8:00 p.m. The last outbound call recorded from Montague's room was at 6:25 p.m. At approximately midnight that evening, a Hampton Inn guest in the room adjacent to Montague's heard a loud bang from the direction of Montague's room. There were no other guests in adjacent rooms or in that wing of the hotel at that time of night.

After she left Montague's hotel room, appellant called Kip Rice, her cocaine supplier, from her car. Rice testified that she "wasn't her usual self," her voice was cracking, and she wanted to come over to his place. Rice told appellant he had company. Appellant then called Bill Shreve and spent from approximately 8:30 p.m. until approximately 3:00 a.m. at his house. When asked if appellant had any cocaine with her when she came to his house, Shreve replied, "No, sir . . . . None that I know of . . . ."

The hotel cleaning crew noticed a "Do Not Disturb" sign on Montague's room door on the morning of August 12, 1994. After

4

noon, they used a master key to gain entry and discovered Montague's body.  The Loudoun County sheriff's department conducted an investigation of the scene.  Montague's body was found lying between two beds next to a round table, which had been moved between the beds.  The telephone was found under Montague's body, and the television was on "pretty loud." Playing cards were found on the round table, along with a writing pad with the initials "C" and "W" on it.  A plastic motel drinking cup was also found on the table.  Bottles of tequila and cinnamon Schnapps were found in the bathroom, together with a cup that was half full of a "caramel color liquid."  Upon inspection, nothing in the room indicated a homicide, and the evidence technician poured the contents of the cup down the drain. Subsequent chemical analysis showed that the cup contained "as little as a nanogram" (0.000000001 g) of cocaine residue.  At some point in the investigation, Janet Hall entered the room and told the officers on the scene that Cassondra Betancourt was responsible.

On August 16, 1994, Dr. James Beyer performed an autopsy. Finding no signs of trauma or needle puncture marks, he made an initial determination of death due to a "dilated cardiomyopathy." No cocaine residue was observed around Montague's face or head.  Subsequent laboratory analysis showed a blood alcohol level of .16 percent and 31.07 milligrams per liter of cocaine in Montague's blood.  Based on the lab analysis, Dr. Beyer changed

his prior assessment to one of death due to cocaine poisoning with the cardiac problem as a contributing cause. Dr. Beyer did not test to determine the path of ingestion of the cocaine, and subsequent testing became impossible when Montague's family chose to cremate his remains. Dr. Beyer testified that in the majority of cocaine poisoning deaths the blood of the victim contains between one and five milligrams per liter of cocaine, and that the large imbalance between cocaine and cocaine metabolite in Montague's blood indicated that he had recently consumed a large amount of cocaine.

Dr. Anh Hyunh, an expert witness for the Commonwealth and the supervisor of the toxicology section of the Fairfax Forensic Laboratory, testified that Montague's system contained thirty times the amount of cocaine necessary to kill him. Based on the unusually high amount of cocaine in Montague's blood, Dr. Hyunh concluded it had been ingested orally or injected. Dr. Hyunh also considered Montague's heart condition and level of alcohol and testified that with "so many factors together [it] could have been a fatal accident."

On August 16, 1994, the sheriff's department phoned Nationwide Insurance and notified the company of Montague's death. On August 19, Investigator Robinette contacted Calvin Mullins, the Life Claims Manager for Nationwide, and informed him that appellant was a suspect. Robinette told Mullins to make sure appellant did not know that the sheriff's department was

6

involved, to take notes of any contact with appellant, and to notify Robinette. Appellant did not contact the company, so Mullins mailed her a claim form and instructed her to complete it. Appellant phoned Mullins on August 31, and he instructed her to complete and return the claim form. She did so, but Nationwide refused to pay the claim, citing lack of information. In January 1995, appellant wrote a letter to Nationwide demanding payment and stating, "Mr. Montague did not die by suicide." Upon learning that appellant had filed a claim, Janet Hall wrote Nationwide a letter threatening to sue if appellant received the money. Hall later filed a claim as an heir and sued Nationwide for its failure to pay.

Carolyn Bothwell, a friend of Hall's, assisted the police investigation by wearing a concealed recording device on six different occasions in a futile attempt to obtain incriminating statements from appellant. Bothwell testified that she, already a convicted felon, was the target of a felony prosecution in Loudoun County at the time of appellant's trial but that her case had been continued. She further testified that she had reached no agreement with the Loudoun County prosecutor's office regarding the effect her cooperation in appellant's case might have on her own prosecution.

Transcripts of appellant's interviews with Investigator Robinette indicated that appellant lied to police about the existence of any life insurance and her activities relating to

7

Kip Rice, her cocaine supplier. At first, she denied knowledge of any insurance and of anyone who would benefit from Montague's death. However, she ultimately admitted that when Montague wanted to obtain life insurance, she chose the Nationwide office and agent. She initially denied phoning Rice on the night of Montague's death, but later admitted she had beeped him and he had returned her call. In one interview, appellant told Robinette she was unable to remember Kip's last name. In the next interview, when the police told her they knew Rice's name and showed her a picture of him, she admitted she had purchased cocaine from him prior to Montague's death but she could not remember exactly when.

Appellant told police that on the night of Montague's death, he had not threatened suicide. Montague never arranged his affairs in preparation for death. He died intestate leaving three heirs: Janet Hall, Richard Montague, and June Warner. Suzette Ronco, Montague's ex-wife and a nurse with some psychiatric experience, testified that while assisting him with his insurance paperwork she had directly asked Montague if he was planning suicide; he said "no."

On February 13, 1995, appellant was indicted for feloniously and unlawfully killing Walter Montague in violation of Code § 18.2-32. A jury found her guilty of first degree murder on September 19, 1995. On November 1, 1995, appellant moved to set aside the verdict and for a mistrial. One of the grounds for the

motions was the failure of the Commonwealth to disclose an agreement with Bothwell, which allegedly would have discredited her testimony.  In response to the allegation, the prosecuting attorney responded, "there's no agreement other than to continue [her case]."  The trial court denied appellant's motions.

II.

Appellant contends the evidence was insufficient to prove beyond a reasonable doubt that she committed first degree murder.  We agree.

The relevant parts of Code § 18.2-32 provide that "[m]urder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree . . . .  All murder other than capital murder and murder in the first degree is murder of the second degree. . . ."  "'To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder.'"  Rhodes v. Commonwealth, 238 Va. 480, 485, 384 S.E.2d 95, 98 (1989) (quoting Smith v. Commonwealth, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980)).  "To prove premeditated murder, the Commonwealth must establish:  (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent."  Archie v. Commonwealth, 14 Va. App. 684, 689, 420 S.E.2d 718, 721 (1992) (citation omitted).

9

"Each element must be proved beyond a reasonable doubt."  Morris v. Commonwealth, 17 Va. App. 575, 581, 439 S.E.2d 867, 871 (1994) (Benton, J., concurring and dissenting) (citing In re Winship, 397 U.S. 358, 364 (1970)).  "Proof of the elements of an offense, of course, includes proof of the corpus delicti."  Watkins v. Commonwealth, 238 Va. 341, 350 n.3, 385 S.E.2d 50, 55 n.3 (1989), cert. denied, 494 U.S. 1074 (1990).  To establish the corpus delicti in a homicide, the Commonwealth must prove the victim's death resulted from the criminal act or agency of another person.  See Williams v. Commonwealth, 234 Va. 168, 175, 360 S.E.2d 361, 366 (1987), cert. denied, 484 U.S. 1020 (1988).  "Premeditation and formation of an intent to kill seldom can be proved by direct evidence.  A combination of circumstantial factors may be sufficient."  Rhodes, 238 Va. at 486, 384 S.E.2d at 98 (citing Epperly v. Commonwealth, 224 Va. 214, 232, 294 S.E.2d 882, 893 (1982)).

Proof by circumstantial evidence "is not sufficient . . . if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture."  Littlejohn v. Commonwealth, 24 Va. App. 401, 414, 482 S.E.2d 853, 859 (1997) (citing Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977)).  "'[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'"  Stover v. Commonwealth, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981)

10

(quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)). "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt." Littlejohn, 24 Va. App. at 414, 482 S.E.2d at 859 (quoting Haywood v. Commonwealth, 20 Va. App. 562, 567-68, 458 S.E.2d 606, 609 (1995)). The Commonwealth need not "exclude every possible theory or surmise," but it must exclude those hypotheses "which flow from the evidence itself." Cantrell v. Commonwealth, 7 Va. App. 269, 289-90, 373 S.E.2d 328, 338-39 (1988) (citations omitted). The evidence in the instant case fails to prove appellant's guilt beyond a reasonable doubt.

Viewed in the light most favorable to the Commonwealth, the evidence established that appellant bought cocaine and visited Montague in his hotel room on the day of his death from cocaine overdose. Although a jury could reasonably infer that appellant provided Montague with the cocaine that killed him, no evidence established the Commonwealth's theory that appellant disguised the cocaine in a drink. No evidence proved that appellant put the cocaine in a drink. Montague could have put cocaine in his own drink or he could have chosen to consume the cocaine in some other way. The Commonwealth destroyed the suspect liquid, and the extremely small amount of cocaine remaining in the cup could have come from multiple sources. No evidence established the

11

time of death or whether appellant was present when Montague died. The evidence does not exclude the reasonable possibility that appellant provided the cocaine for recreational use, and Montague either accidentally or deliberately ingested an excessive dose near midnight, around the time of the unexplained noise from the direction of his room.[1]

"Where a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates the accused." Littlejohn, 24 Va. App. at 411, 482 S.E.2d at 858 (citation omitted). Accord Haywood v. Commonwealth, 20 Va. App. 562, 567, 458 S.E.2d 606, 609 (1995). The reasonable hypothesis that Montague consumed the cocaine by

---

[1]Appellant was charged with and convicted of premeditated first degree murder, not felony-murder. See Code § 18.2-32. However, under the hypothesis that Montague consumed the cocaine by choice, the facts sufficiently resemble our felony-murder cases to warrant distinction. See, e.g., Hickman v. Commonwealth, 11 Va. App. 369, 398 S.E.2d 698 (1990), aff'd, 242 Va. 263, 410 S.E.2d 88 (1991).

In a felony-murder case, the malice inherent in the predicate felony is sufficient to prove the malice required for a conviction of second degree murder. See id. However, the malice of an underlying felony does not satisfy the element of premeditation required for first degree murder. See Archie v. Commonwealth, 14 Va. App. 684, 420 S.E.2d 718 (1992). Additionally, felony-murder requires that the death occur within the res gestae of the predicate offense; the two events may not be separated by time, place, or other circumstances. See Talbert v. Commonwealth, 17 Va. App. 239, 436 S.E.2d 286 (1993). In the instant case, no evidence established either the reason Montague consumed an excessive dose of cocaine or appellant's presence at the time of his death. If Montague ingested the cocaine near midnight, his death occurred several hours after appellant provided him with the drug and departed.

choice is inconsistent with proof beyond a reasonable doubt of the "criminal act or agency of another person" and the "performance of that act with malicious intent" required for the corpus delicti and actus reus elements of premeditated murder.

Assuming appellant had a motive to kill her business partner for the insurance proceeds, motive alone does not prove the requisite intent for a murder conviction. No evidence explains why Montague had to phone appellant multiple times before she agreed to join him at the hotel. The record provides no explanation for appellant's attempts to encourage Montague to have the physical examination required to finalize the policy if she believed she could collect the proceeds without one. No evidence explains why appellant did not initiate a claim for the life insurance benefits until the company contacted her and instructed her to do so. The evidence does not prove beyond a reasonable doubt that appellant was the criminal agent in a homicide or had the specific intent to kill required for a conviction of premeditated murder.

Taken in the light most favorable to the Commonwealth, the evidence in this record does not exclude the hypothesis that Montague died as a result of an accidental or deliberate self-inflicted overdose after appellant left his hotel room. "The circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt." Sam v.

13

Commonwealth, 13 Va. App. 312, 319, 411 S.E.2d 832, 836 (1991) (citation omitted). Viewed as a whole, the circumstantial factors here are suspicious, but they do not prove beyond a reasonable doubt either the existence of a homicide or the identity of appellant as the criminal agent. "Suspicion, no matter how strong, is not enough. Convictions cannot rest upon speculation and conjecture." Littlejohn, 24 Va. App. at 415, 482 S.E.2d at 860 (citations omitted). For the foregoing reasons, we reverse the conviction.

Reversed.