BENTON, J., with whom ELDER, J.,
joins, concurring, in part, and dissenting, in part.
I concur with the majority opinion on the issues of double jeopardy and prosecutorial misconduct. I dissent, however, from the majority’s conclusion that the evidence was sufficient to sustain the convictions.
I.
At trial, the evidence proved that on the morning of November 18, 1993, a friend of Merry Pease’s husband approached him at work because he thought Pease’s husband was angry *362 with him. He testified that Pease’s husband was acting differently than normal and “just wasn’t his self.” Pease’s husband said he thought Pease was having an extra-marital affair, and he said “something was going to happen real soon.” The co-worker told Pease’s husband that when he thought his own wife was having an affair, he had removed the ignition coil from her car so that she could not leave home. Pease’s husband left work at the end of his shift at 8:00 a.m.
Later that afternoon, Pease loudly knocked at the door of a neighbor, who was a police officer, and said, “I have been shot. Help me.” The neighbor called the emergency number and then attended to a wound near Pease’s abdomen, where a “bullet had penetrated all the way through her.” He saw a powder burn on her clothing and on her hand. In response to the neighbor’s questions, Pease said her husband shot her and she had n.ot touched the gun. Although he later wrote that Pease was shot “point blank,” the neighbor testified that this was only his interpretation of what she said. He testified that Pease told him the following events occurred:
She said that they had been arguing and having some problems. That she had went to the back door, or the back bedroom to the door and was knocking on the door trying to get Dennis to come out. And she said that he jerked the door open and pointed the gun at her and shot her. And she turned around and ran out of the residence.
The neighbor testified that Pease said “as [she] went out of the house, [she] may have heard another shot.” Pease also told him that her husband had disabled her car and that she first went to the road to get help but no one stopped.
Pease was transported to a hospital where she received medical treatment for a life-threatening wound to her abdomen. Several investigators questioned Pease after she arrived at the hospital. Investigator Darnell testified Pease said that she and her husband had argued for “a couple of weeks,” that her husband had taken her checkbook, and that, on this day, she had been unable to start her car. Pease also said she *363 was five to eight feet from her husband, near a kitchen chair, when he shot her.
Investigator Robinson testified that they did not record then* interview with Pease. He recalled she said the following in the interview:
[S]he had gone to the bedroom door of the master bedroom and asked ... what he had done to her car.
She turned and walked away from the bedroom into the kitchen or the bedroom door into the kitchen. The bedroom door opened and she turned and [he] fired a pistol striking her in the abdomen.
He came towards her. He brandished the pistol. She said she struck the pistol with her right hand and asked him, said please don’t kill me, she jerked away from him and ran out the mobile home and ran seeking assistance at the next door neighbors’.
The police discovered Pease’s husband dead in the living room of the home with two gunshot wounds, one to his right lung and a second wound to his heart. He was not wearing shoes or a shirt. A woman’s underpants, drenched in his blood, was near his left hand. Feathers were on and near his body. In his pocket, the police found a wire from a car’s distributor cap and a wire that had been removed from the home’s telephone. A Ruger .357 revolver, which was the weapon that fired the bullets, was on the floor near his body; it had three empty chambers. The Commonwealth offered as evidence the autopsy report, which described the two gunshot wounds. The report also contains the notation: “If [the] wound [to the lung] was the first shot, [Pease’s husband] would have been capable of inflicting both wounds.” Pease’s husband’s blood had an alcohol content of .10.
The record contains extensive testimony concerning the condition and configuration of the mobile home residence. When the police entered the home, the primary bedroom was in disarray. The blinds from the bedroom window were on the floor and demolished. Feathers from a burst pillow were strewn about. The bedroom door, which could be locked from *364 inside, was only six feet from the kitchen table. A kitchen chair was overturned in the hallway between the two rooms. Pease’s husband’s shoes were in one of the children’s bedrooms, along with his cigarettes and an alcoholic drink. A desk had been overturned in that room.
The investigators found a bullet lodged in an ironing board near the kitchen. Another bullet, which caused the wound to Pease’s husband’s heart, was found lodged in his back. The investigators searched that night for the third bullet but were unable to locate it. They also found no hole that the third bullet may have caused in the structure or its furnishings.
The next morning, the investigators again visited Pease in the hospital. One investigator said when they questioned Pease, she said she was in a lot of pain but wanted to talk. During this interview, Pease recounted the following:
[TJhey had been arguing for about two weeks about money and the kids, that that day they were arguing about money and she made a comment that he wouldn’t give her enough money to run the household, that they had been arguing that morning about money.
* * * * * *
She indicated she had went to the bedroom door to begin with because her husband, Dennis, had went to her car and done something to her car and came back into the trailer into the master bedroom, locked the door.
She went to the door and asked him what have you done to my damn car and he opened the door and shot her.
* * * * * #
She gave Investigator Mullins an explanation that [her husband] had caught up with her, she was headed toward the living room but he had caught her in the kitchen and she had hit his hand that had the gun in it but that she never touched the gun.
* * *
When she pushed his hand that had the gun in it away in the kitchen, she ran out the front entrance of the trailer and *365 she thought she heard another shot as she was running off the porch, the front porch of the trailer.
About two weeks later, Investigator Mullins visited Pease at her home. He testified that he told her the police could not rule this case a suicide because they “have got a missing bullet, the one you was [sic] shot with and, you know, we can’t find it.” When he asked if her husband abused her in the past, Pease said that she and her husband had argued about her spending more time with him, that she had told her husband she had to spend several days each week with her father, and that they had discussed getting a divorce. She said her husband had never accused her of being unfaithful, but he was extremely obsessive and possessive. Pease also told the investigators that her husband was strict with her children, that he was verbally abusive toward her, but that she had never obtained warrants against her husband for abuse. When asked if she had heard any shots after she left the house, she said she had not.
Investigator Mullins testified that Pease called a few days later to inform him she had located the bullet. . "When he returned to Pease’s home, Pease moved the curtain on the kitchen window and exposed a .38 caliber bullet. Investigator Mullins testified that the bullet was “lying ... in the [windowsill like it had never been moved.” He also testified that the bullets were “wad cutters” that had previously been reloaded. He explained that the charges in the bullets were not as powerful as commercially purchased bullets and that, when shot from the gun, the bullet would not travel as fast as a regular, manufactured bullet.
The Commonwealth produced extensive evidence from police investigators and forensic experts. The investigators found no blood and no discernible fingerprints on the gun. They also found no indication that the gun had been wiped clean. An expert in gunshot residue testified that his analysis did not allow him to conclude whether Pease or her husband fired the weapon. He testified that Pease’s husband had primer residue on both hands and that Pease had primer *366 residue on her face and right hand and “particles that were indicative of primer residue on her left hand.” The gunshot residue on hands could indicate the person fired a weapon or was in close proximity to the discharge of a weapon or handled a dirty weapon. He also testified “it would not be unusual at all for ... primer residue to be found on [an] individual at a [distance] of six feet” and he would expect to find primer residue if an individual had a hand around the barrel of a revolver or around the cylinder.
An expert in the field of firearms and toolmarks testified that, based on his examination of Pease’s sweatshirt, the muzzle of the revolver was “at or near contact” with Pease when it was discharged at her. He testified that a hand could have a gunpowder burn even without coming in contact with the gun “[i]f the heel portion of the hand was directly above the muzzle, then it would pick up the residue as opposed to the extending fingers or down the elbow.” The firearms expert testified that in order for gunpowder to deposit on a person’s hand the person’s hand would have to be less than one inch away from the gun and that he would not anticipate a burn on the heel of a person’s hands would be caused by simply touching the gun when it was not firing.
A blood stain and spatter expert testified that the shots to Pease’s husband would not necessarily cause blood to spray from the wound. She also testified that there was “one blood trail with connecting blood drops that connect from the bedroom area through that hall, through the kitchen and into the living room.” There was no indication that there had been multiple paths. The expert testified further that the blood on the floor between the kitchen and the living room had been disturbed “which indicates that ... something had come into contact with that to move or to alter the blood that was in that pre-existing stain pattern.” She testified that if someone’s heel had disturbed the blood drop, that the foot would create a “diminishing repetitive transfer ... every time it stepped.” She also testified that there was evidence of such transfers on the floor and that a stain on the heel of Pease’s husband’s foot indicated he was responsible for the transfer.
*367 Testifying as Pease’s witness, the assistant chief medical examiner gave the only testimony about the autopsy report. He testified that if he had to choose, it is more likely that the shot to the heart was immediately incapacitating as opposed to the shot to the lung. He opined that a person with a bullet wound to the lung, such as found in Pease’s husband, could live “at least a few minutes, probably several minutes ... [a]nd in some cases, perhaps, ... several hours.” He testified that such a person “would have had enough strength and presence of mind to do a great many things including” walking twelve to fifteen feet and pulling blinds and curtains off the wall. He also testified that such a person could walk twelve to fifteen feet after being shot without dropping any blood on the floor and that it was not possible to conclude when the blood started to flow because that would depend on a number of factors including the position of that person’s body. He farther testified that it was possible that a person with this type of wound to a lung could have walked another twenty feet, the distance from the bedroom to the living room, and inflicted the second wound. He testified that “in the absence of any extraneous information, you could say this could be self inflicted or inflicted by someone else.” He also testified that Pease’s husband had a .10% blood alcohol content which would have affected his judgment.
At the conclusion of the evidence, the jury convicted Pease of second degree murder and use of a firearm in the commission of murder.
II.
“It is essential in every prosecution for the commission of a homicide that the Commonwealth prove the corpus delicti.” Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978). “To establish the corpus delicti in a homicide, the Commonwealth must prove the victim’s death resulted from the criminal act or agency of another person.” Betancourt v. Commonwealth, 26 Va.App. 363, 373, 494 S.E.2d 873, 878 (1998). As a matter of constitutional law, the Due Process Clause protects an accused from conviction “except upon proof *368 beyond a reasonable doubt of every fact necessary to constitute the crime with which [she] is charged.” In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).
No one saw Pease shoot her husband; thus, the Commonwealth relied upon circumstantial evidence to support the conviction. When a conviction is based entirely upon circumstantial evidence, we are guided by the following standards in our review:
[W]ell established principles apply to testing the sufficiency of circumstantial evidence. [The Supreme Court has] summarized those principles as follows:
“... [I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty____”
But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.
Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977) (citations omitted).
The majority reasons that because the evidence provides a reasonable basis from which the jury could conclude Pease killed her husband, this Court must defer to the jury’s decision. This reasoning, however, disregards the prosecutor’s obligation to exclude every reasonable hypothesis of innocence whenever, as here, a conviction is based solely on circumstantial evidence. The law is clear:
*369 Proof by circumstantial evidence “is not sufficient ... if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture.” Littlejohn v. Commonwealth, 24 Va.App. 401, 414, 482 S.E.2d 853, 859 (1997) (citing Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977)). ‘“[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.’ ” Stover v. Commonwealth, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981) (quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)). “When, from the circumstantial evidence, ‘it is just as likely, if not more likely,’ that a ‘reasonable hypothesis of innocence’ explains the accused’s conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt.” Littlejohn, 24 Va.App. at 414, 482 S.E.2d at 859 (quoting Haywood v. Commonwealth, 20 Va.App. 562, 567-68, 458 S.E.2d 606, 609 (1995)). The Commonwealth need not “exclude every possible theory or surmise,” but it must exclude those hypotheses “which flow from the evidence itself.” Cantrell v. Commonwealth, 7 Va.App. 269, 289-90, 373 S.E.2d 328, 338-39 (1988) (citations omitted).
Betancourt, 26 Va.App. at 373-74, 494 S.E.2d at 878.
A jury’s verdict founded merely upon a reasonable belief that Pease killed her husband is not a sufficient basis to meet the standard of proof beyond a reasonable doubt. Such a verdict simply means there is some evidence consistent with her guilt. See Sullivan v. Louisiana, 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (noting that the constitutional standard of proof beyond a reasonable doubt is not satisfied by “hav[ing] a jury determine that the defendant is probably guilty”). The Supreme Court has “emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability.” Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). These principles also are articulated decisions as follows:
*370 It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence.
Cameron v. Commonwealth, 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970) (citations omitted) (emphasis added). In short, as here, where “inferences are relied upon to establish guilt, they must point to guilt so clearly that any other conclusion would be inconsistent therewith.” Dotson v. Commonwealth, 171 Va. 514, 518, 199 S.E. 471, 473 (1938).
Several investigators and Pease’s neighbor testified from their notes about statements Pease made to them at various times. None of Pease’s statements were recorded, and Pease gave no written account of the events. In each rendition of Pease’s statements, however, Pease denied shooting her husband and said her husband shot her. Noting that Pease made several statements concerning the events and her conduct that ensued, the Commonwealth argues in its brief, that the jury could reasonably find that Pease contradicted herself on various things including (i) whether a struggle occurred in the kitchen, (ii) her distance from her husband when he shot her, (iii) whether she heard a shot as she ran from the home, (iv) whether she found the bullet on the windowsill, and (v) how she received the burn on her hand. None of the conflicts, however, excludes Pease’s story that her husband committed suicide.
Although the jury is entitled to believe that Pease made contradictory statements, Pease’s statements concerning what transpired must be viewed in the context in which they were made. The Supreme Court has held that “[t]he probative value of [a defendant’s] inconsistent statements must be determined in light of the situation in which they were made.” Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977). Pease’s conflicting statements unquestionably were *371 made at a time when Pease was in severe pain from the gunshot wound. Furthermore, most of the conflicts in the statements concerned matters that are not material concerning the identity of the shooter.
The evidence proved the events occurred inside a mobile home, where the distances are not great. Although the evidence proved the bedroom was in disarray, no evidence established that Pease caused it or was in the bedroom when it occurred. The evidence is consistent with her statements that her husband locked himself in the bedroom after he removed a wire from the car’s distributor cap. The evidence further proved that Pease’s husband had been drinking alcohol and that the room where his drink was located was also in disarray. Moreover, the evidence proved that the distance from the door of the bedroom to the kitchen table was only six feet. Each of Pease’s statements places her between the bedroom door and the kitchen when she was shot. The Commonwealth’s firearms expert testified that the muzzle of the firearm was “at or near contact” with her when it was fired. The expert’s testimony is not inconsistent with Pease’s statements that she did not fire the gun. This evidence is also consistent with Pease’s defense that her husband shot her in this area at close range.
The Commonwealth and the majority opinion make much of the fact that Pease found the third bullet and suggest that the jury could find that she placed it there. The evidence is undisputed, however, that three bullets were discharged from the gun. Although the investigators searched the residence, they did not find it. Tellingly, one investigator testified, when asked whether he was looking for the bullet or the bullet hole, “[w]ell of course, we were looking for the bullet hole. You have got to find the hole before you can find the bullet.” Indeed, it is likely the officers failed to find the bullet because they were looking for a bullet hole.
The evidence proved that the bullet had been reloaded and did not have the usual charge. The bullet was a “homemade reload” with a “low load.” Thus, a forensic expert testified *372 that such a bullet, having an altered, reduced charge which passed through a body, could have struck the structure without penetrating it and fallen to the windowsill. The forensic evidence, therefore, does not negate the conclusion that the bullet landed in the windowsill. Indeed, the forensic expert testified that if the gun was shot from the bedroom area door at someone in the hallway, the bullet could possibly go to the kitchen window area. Depending on trajectory, velocity, and the angle of the bullet, the bullet could have landed on the windowsill.
In addition, no evidence explained the red fiber the Commonwealth contends was on the bullet. The Commonwealth did not ask the examiners to compare it with any other fibers. Moreover, the forensic expert testified that he did not know, of his own knowledge, that the fiber came from the bullet. The evidence proved, however, that the officer who collected the bullet from the windowsill put it in a bag that “came from [his] lunch” and, thus, may have exposed the bullet to extraneous substances.
Moreover, the evidence does not conclusively establish that the bullet found lodged in the ironing board was the bullet that penetrated Pease. The firearms expert testified that the bullet that went into the ironing board was on a downward trajectory. The evidence established that in order for this to be the bullet that went through Pease’s abdomen Pease would have had to be against the wall when the shot was fired. Given the downward trajectory of the bullet, it could also have been the bullet that entered Pease’s husband’s lung. Therefore, this evidence is consistent with the forensic evidence that the bullet retrieved from the windowsill was the bullet that wounded Pease. In view of the forensic evidence, the investigators’ testimony that they thoroughly searched the house for the third bullet reasonably establishes that they obviously overlooked the bullet in the windowsill.
The Commonwealth also argues that the evidence is inconsistent with Pease’s assertion that she was not present when her husband was wounded. The Commonwealth points to a strand of Pease’s hair found in the puddle of blood from her *373 husband’s mouth and to a foreign DNA substance found on Pease’s shoe as evidence that Pease was present when her husband was shot. Although the evidence established that one blond hair that had been forcibly removed from Pease’s head was in a puddle of blood near her husband’s mouth, an expert in hair and natural fiber examination testified that it was possible the hair could have been removed in combing. Only one strand of hair was found. The expert testified it was unlikely that only one strand of hair could have been forceably pulled from a person’s head by another person. The expert also testified that this hair could have been transported from the husband’s clothes. Furthermore, Pease’s hair would likely be found at any place in her own residence.
A forensic expert in DNA testing testified that DNA material, consisting of blood and some other material, was found on Pease’s left shoe. He explained that “the major profile [of the DNA found in the blood] was consistent with ... Pease.” There were also regions of DNA with genetic material inconsistent with Pease’s DNA. The DNA material in these regions could have been indicative of a small amount of blood or saliva, sweat, or some other bodily fluid. Although the expert could not rule out Pease’s husband as a possible contributor, the DNA was also found in one out of seven people of the Caucasian population in that region. More importantly, the expert could not identify when the DNA material was deposited. Therefore, neither piece of evidence establishes that Pease was present when her husband was wounded. This evidence was merely indicative of the fact she lived in the residence.
The Commonwealth argues that the jury could reject Pease’s hypothesis that her husband shot her and then shot himself. It argues that her husband had told his co-worker that he believed Pease was having an extra-marital affair, that Pease was unsympathetic after her husband’s death, and that Pease had a financial motive to kill her husband.
Although the record contains extensive testimony about forensics, the evidence fails to disprove the hypothesis that Pease’s husband was the shooter. A large amount of testimo *374 ny centered on where the shots were fired and whether the location of the bullets matched Pease’s account of what had transpired. The assistant chief medical examiner testified that it was certainly possible for Pease’s husband to inflict both wounds to himself. He testified that after the first lung shot, a person could live “at least a few minutes, probably several minutes ... [a]nd in some cases, perhaps, ... several hours.” He testified that Pease’s husband “would have had enough strength and presence of mind to do a great many things including” walking into the bedroom and pulling blinds and curtains off the wall. Moreover, he also testified that Pease’s husband’s intake of alcohol would have affected his judgment.
He further opined that it was also possible that Pease’s husband could have walked from the bedroom to the living room, which is immediately adjacent to the kitchen area, and inflicted the second wound. Although he did not know whether it happened, he testified that it was possible for a person to walk twelve to fifteen feet after being shot without dropping any blood on the floor. According to the assistant chief medical examiner, it was just as reasonable as not to believe that Pease’s husband walked down the hallway without depositing blood, pulled the blinds from the window, and shot himself in the heart.
The Commonwealth argues that because there was blood on Pease’s husband’s hands, he could not have handled the gun to fire the second shot to his heart which an expert explained would have been immediately incapacitating. A blood stain and spatter expert explained, however, that the shots to Pease’s husband would not necessarily cause blood to spray from the wound. The experts also testified that the blood on Pease’s husband’s hands could have come from coughing blood from his nose and mouth. Although there was evidence that Pease’s husband could have been carrying, in one hand against his wound, the woman’s underpants that were found by his body, no evidence ruled out the reasonable possibility that Pease’s husband had blood on the hand carrying the woman’s underpants and no blood on the other hand carrying the gun.
*375 The evidence revealed that no blood from the heart shot had flowed down toward Pease’s husband’s jeans but a small amount of the blood had flowed across his back as he lay on the floor. Contrary to the blood spatter expert’s opinion that there was no indication Pease’s husband had been upright when the shot to his heart was fired, the assistant chief medical examiner testified that Pease’s husband could have been standing but the blood began flowing after he was on his side. He also opined that Pease’s husband could have been standing when the shot to his lung was fired and that it was not necessary for him to have been against any surface for the bullet to have remained lodged in his back. In short, the evidence did not negate the hypothesis that Pease’s husband fired the second shot and that he committed suicide.
Although the Commonwealth argues that the jury could infer that Pease had a motive to kill from the husband’s belief that Pease was having an affair, no evidence in this record establishes the truth of the husband’s supposition. The testimony by the co-worker of Pease’s husband gives an indication, however, of the husband’s beliefs and his state of mind. Indeed, the testimony reveals that several hours before the shooting the husband was “not [him]self,” appeared to the coworker to be angry, and expressed the view that “something was going to happen real soon.” The evidence further proved the husband drank enough alcohol to affect his judgment after he left work that morning. He also disabled Pease’s car, as his friend suggested, and disabled the telephone in the home. This evidence tends to prove that Pease’s husband had a motive to initiate what transpired in the Pease home on November 18,1993.
Investigator Parker testified that Pease was present when investigators interviewed the deputy chief medical examiner regarding the incident. When the investigators asked the medical examiner whether Pease’s husband had been in pain after the first shot, Pease said “a lot.” Another investigator testified that he was present when Pease viewed the pictures of her house and her deceased husband. He said Pease *376 laughed when she saw the pictures, and another witness stated that Pease “was giggling and laughing and pointing at them and making notes on a paper.” Although these were matters the jury could consider, they indicated only inappropriate reactions after the fact and are not inconsistent with the conclusion that her husband shot her.
The Commonwealth also notes that Pease’s neighbor testified that while Pease was in his home waiting for the emergency response team, he overheard part of the conversation she was having with his wife. He testified that Pease was telling his wife about “some problems she had been having.” After discussing the need to have someone get her children, Pease then “leaned back in the chair” and said “I either done or did it all for [my children].” Although the Commonwealth argues that the jury could have concluded that Pease’s statement was incriminating, Pease’s neighbor’s testimony clearly indicates that he heard only part of the conversation. The evidence fails to reveal the entire context in which Pease’s statement was made. Pease’s comment could reasonably relate to the discussion she was having with her neighbor’s wife about her marital problems. Indeed, Pease later told the investigators she and her husband had argued for weeks about their children and her husband’s failure to provide “enough money to run the household.” Thus, this evidence is also not inconsistent with the hypothesis that her husband shot her. Where the facts are “equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, the jury cannot arbitrarily adopt the interpretation which incriminates [the accused].” Massie v. Commonwealth, 140 Va. 557, 564, 125 S.E. 146, 148 (1924).
A witness from the Social Security Administration testified that as a result of Pease’s husband’s death Pease would receive $718 a month until her youngest daughter was age 16 and her two children would receive $718 a month until they were age 18. No evidence proved, however, that Pease knew that she would receive this amount of social security benefits as a result of her husband’s death. Without additional speculation, this evidence does not aid the Commonwealth’s theory *377 that Pease wanted to kill her husband to advance her personal financial gain.
Viewed in the light most favorable to the Commonwealth, the evidence does not exclude the reasonable hypothesis that Pease’s husband shot her and himself. The forensic evidence does not exclude that reasonable hypothesis. The close contact nature of the shots is consistent with that hypothesis. “[T]he doctrine [is long-standing] that where the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be.” Massie, 140 Va. at 565, 125 S.E. at 148 (citing Johnson’s Case [Johnson v. Com.], 70 Va. (29 Gratt.) 796, 817, 1878 WL 5845 (1878)). In view of the significant, substantial evidence of suicide, the jury could not have inferred beyond a reasonable doubt from the evidence that Pease killed her husband. As in this case, convictions cannot be based on “speculation and surmise.” Lane, 219 Va. at 515, 248 S.E.2d at 784. Because the Commonwealth failed to exclude Pease’s hypothesis of innocence, and all circumstantial evidence is not consistent with guilt, I would hold the evidence was insufficient to prove Pease’s guilt beyond a reasonable doubt.