COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Athey and Callins


ANTON DEONTE COLEMAN

                                                                    MEMORANDUM OPINION*
v.        Record No. 0294-24-2                                      PER CURIAM
                                                                    MAY 27, 2025
COMMONWEALTH OF VIRGINIA


                      FROM THE CIRCUIT COURT OF POWHATAN COUNTY
                                      Paul W. Cella, Judge

              (Brett P. Blobaum, Senior Appellate Attorney; Virginia Indigent
              Defense Commission, on briefs), for appellant.

              (Jason S. Miyares, Attorney General; Lauren C. Campbell, Assistant
              Attorney General, on brief), for appellee.


        On July 20, 2023, a jury empaneled in the Circuit Court of Powhatan County ("trial

court") convicted Anton Deonte Coleman ("Coleman") of second-degree murder.  On appeal,

Coleman contends that the trial court erred by denying his motions to strike and set aside the jury's

verdict.  Specifically, he asserts that the evidence was insufficient to establish that he was the

perpetrator.  Finding no error, we affirm the trial court's judgment.[1]

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

        [1] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit."  Code § 17.1-403(ii)(a);
Rule 5A:27(a).

## I. BACKGROUND[2]

In June of 2018, K.A.[3] was a 17-year-old high school student. She and her mother, Vikisha Smith ("Vikisha"), moved into the home of her maternal grandmother, Delores Smith ("Delores"). Later that month, K.A.'s cousin, Coleman, moved into the home as well. Coleman was affixed with an ankle GPS monitor to track his movements.[4]

On June 24, 2018, Delores hosted a family cookout at her home. During the event, Kendra Green ("Green"), who is K.A.'s sister, heard Coleman asking her sister, K.A., "Are you going to do it for me?" When Green left the event, only Delores, K.A., and Coleman remained in the home. Although Delores recalled seeing Coleman's father at the event, she did not see him interact with K.A. Delores recalled speaking with K.A. about taking her to cheerleader practice the next day.

The following morning, Vikisha left for work before 6:00 a.m. and recalled seeing K.A. asleep in her room. Around 10:45 a.m., Vikisha tried to reach K.A. by phone several times, but K.A.'s phone went straight to voicemail. Delores was also unable to reach K.A. by phone that morning. Vikisha eventually called Coleman to ask if K.A. was at the house. Coleman replied that K.A. was not at the house and that she had left the house with an unknown boy. Coleman could not describe either the boy or the car. Vikisha then called K.A.'s father, Andre Adkins ("Andre"), and asked him to go to the home. Shortly thereafter Vikisha learned that K.A. had not attended cheer

---

[2] "On appeal, we recite the facts 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Konadu v. Commonwealth*, 79 Va. App. 606, 609 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). "Doing so requires that we 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). The record in this case was partially sealed. Thus, "to the extent that we mention facts found only in the sealed record, we unseal those specific facts, finding them relevant to our decision" and leave the rest sealed. *Daily Press, LLC v. Commonwealth*, 301 Va. 384, 393 (2022).

[3] We use initials to protect the victim's family's privacy.

[4] It is unclear from the record why Coleman was being monitored.

practice that morning. When Andre arrived at the house, he encountered Coleman, who told Andre that K.A. had left. Coleman provided no further details. Coleman's father later picked up Coleman, and Coleman did not return to the house.

Salim Mwaruwa ("Mwaruwa") who was in a relationship with K.A. and spoke with her daily was interviewed as well. Mwaruwa stated that on June 25, 2018, he spoke with K.A. by phone around 8:00 or 9:00 in the morning. He further stated that they were both going to work and that following work, K.A. was going to cheer practice. Mwaruwa also stated that later on that same day, when he tried to contact K.A. by text message on his noon lunchbreak, the text did not go through to her. Similarly, after work, Mwaruwa was unable to contact K.A. by phone or text.

Later, during the afternoon of June 25, 2018, Delores told the investigators that she saw a stain in the middle of K.A.'s comforter and found K.A.'s wallet, purse, and her cheer supplies still in her bedroom. K.A.'s aunt, Sheila Rives ("Rives"), also recalled seeing Coleman running down the street earlier that morning between 10:30 and 11:30 a.m. in the direction of a nearby carwash. Vikisha, unable to locate K.A., called the police near midnight to report K.A.'s. disappearance.

As a result of the reported disappearance, Dinwiddie County Sheriff's Deputy Matthew Hayes ("Deputy Hayes") responded to the house late on the night of June 25, 2018. Deputy Hayes noted that Vikisha and Delores were visibly upset and worried about K.A. Dinwiddie County Investigator Steven Shifflet ("Investigator Shifflet"), who was assigned to the investigation, questioned Coleman the following day. Coleman told Investigator Shifflet that he had seen K.A. around 9:00 a.m. the previous day and that he did not leave the house on June 25.

Law enforcement employed a cadaver dog to search Delores's residence on June 27, 2018. The cadaver dog found K.A. dead, lying face down in a shallow grave on the property with trash bags covering her head. The police also found coffee grounds in the trash bags covering her head. Green later testified that she regularly had breakfast with Delores and routinely saw Delores deposit

coffee grounds into her trash. When the police found K.A.'s body, the zipper on her pants was unzipped, and her shirt and bra were pulled up, exposing her breasts. Officers also found a piece of broken glass in K.A.'s bedroom.

Dr. Jennifer Bowers ("Dr. Bowers"), who performed K.A.'s autopsy, opined that K.A. died of asphyxiation. Dr. Bowers explained that, in her opinion, the plastic bag around K.A.'s head deprived her of oxygen leading to K.A.'s death. In addition, Dr. Bowers's DNA analysis revealed that the DNA samples taken from K.A.'s fingernails on her left hand could not have come from her. Instead, Dr. Bowers concluded that the DNA sample included at least two males and that Coleman could not be eliminated as a major contributor to the male DNA sample obtained from K.A.'s fingernails. Lieutenant David Gunn ("Lieutenant Gunn"), who also participated in the investigation, obtained phone records from Coleman and K.A. as well as GPS information from the ankle bracelet Coleman was wearing. As a result of the investigation, Coleman was arrested, charged, and indicted for second-degree murder, among other offenses.[5]

During a week-long jury trial, the Commonwealth elicited the testimony of K.A.'s family members, Mwaruwa, the officers involved with the investigation, and Dr. Bowers, who testified to the aforementioned facts and expert opinions. Demian Futterman ("Futterman"), president of Virginia Electronic Monitoring Systems, further testified that he affixed the monitoring device to Coleman on June 13, 2018. Futterman further explained that the device communicates location information every ten minutes and transmits the location. Futterman confirmed that he had not received any alerts about the device until it was removed on June 28, 2018.

Federal Bureau of Investigations Special Agent Jeremy D'Errico ("Agent D'Errico") also testified as an expert in the field of historical location data analysis. Agent D'Errico examined cell

---

[5] Before trial, the Commonwealth nolle prossed charges against Coleman of murder in the first degree under Code § 18.2-32 and an abduction with intent to defile charge under Code § 18.2-48.

phone and ankle monitor GPS data and created a map demonstrating his findings. He demonstrated to the jury that K.A.'s phone last communicated with the network at 11:35 a.m. on June 25. The phone data showed that K.A.'s phone remained in the area of Delores's house that entire morning. It also showed that Coleman's cell phone used the same cell tower as K.A.'s phone. Coleman's ankle bracelet's data also showed that he was at the residence for most of the morning but that he moved to the northwest side of the address at 10:05 a.m. and then went down the road. From 11:55 a.m. to 12:21 p.m., Coleman's monitor was in the wooded area where the police later found K.A.'s body. The GPS data then showed that Coleman moved from the residence to the area of the carwash and returned to the residence a short time later. Afterwards, the device's data showed that Coleman moved to the wooded area where the police found K.A. and made another trip to the carwash about two hours later.

At the conclusion of the Commonwealth's case, Coleman moved to strike. He argued that "the foundation of the Commonwealth's case [wa]s nothing but guess work, nothing but assumptions, [and] nothing but they might be able to show he was in the woods on the day that she might have died" without more. The trial court denied his motion to strike. Coleman then renewed his motion to strike, which was denied. The trial court then instructed the jury before the parties' closing arguments. The jury deliberated and on July 20, 2023, returned their verdict finding Coleman guilty of second-degree murder. Coleman moved to set aside the jury verdict, but the trial court denied his motion. On January 31, 2024, the trial court sentenced Coleman to 40 years in prison with 20 years suspended. Coleman appealed.

II. ANALYSIS

A. *Standard of Review*

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285

Va. 187, 223 (2013)). "We review appellant's challenge to the trial court's denial of his motion to strike under familiar principles." *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017). "In the context of a jury trial, a trial court does 'not err in denying [a] motion to strike the evidence [when] the Commonwealth present[s] a *prima facie* case for consideration by the fact finder.'" *Id.* (alterations in original) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)). "What the elements of the offense are is a question of law that we review de novo." *Diaz v. Commonwealth*, 80 Va. App. 286, 313 (2024) (quoting *Linnon*, 287 Va. at 98). But we "review[] a lower court's findings of fact 'with the highest degree of appellate deference.'" *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Barney*, 302 Va. 84, 96 (2023)). Per this deference, "the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (internal quotation marks omitted).

As a result, "when reviewing whether the evidence was sufficient to convict a defendant of a criminal offense, an appellate court has a 'limited' role, and '[t]he only relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Wilkerson*, ___ Va. at ___ (alterations in original) (quoting *Garrick*, 303 Va. at 182). We "may neither find facts nor draw inferences that favor the losing party that the factfinder did not. This remains so even when the factfinder *could* have found those facts or drawn those inferences but, exercising its factfinding role, elected not to do so." *Garrick*, 303 Va. at 182. "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). "Whether malice existed is a question for the jury." *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992).

B. *The trial court properly denied Coleman's motions as the record is replete with evidence supporting the Commonwealth's prima facie case.*

Coleman assigns error to the trial court for denying his motions to strike and set aside the verdict, asserting that the circumstantial evidence presented at trial was insufficient to establish that he was the perpetrator. We disagree.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). On appeal, we review the trier of fact's determination regarding the identity of the criminal actor in the context of "the totality of the circumstances." *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 249 (1992)).

"Second-degree murder, of which the jury convicted appellant, is defined as a malicious killing." *Diaz*, 80 Va. App. at 313 (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). "In order for an act to be done maliciously, the act must be done 'wilfully or purposefully.'" *Woods*, 66 Va. App. at 131 (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch*, 14 Va. App. at 841).

In proving the offense, it is well-established that in considering a sufficiency challenge, "[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence,

not those that spring from the imagination of the defendant." *Simon*, 58 Va. App. at 206 (quoting *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993)). "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc) (alteration in original) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). "In other words, in a circumstantial evidence case . . . the accumulation of various facts and inferences, each mounting upon the others, may indeed provide sufficient evidence beyond a reasonable doubt" of a defendant's guilt. *Id.*

Proof by circumstantial evidence "is not sufficient . . . if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture." *Littlejohn v. Commonwealth*, 24 Va. App. 401, 414 (1997) (quoting *Hyde v. Commonwealth*, 217 Va. 950, 955 (1977)). "[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence." *Stover v. Commonwealth*, 222 Va. 618, 623 (1981) (quoting *Inge v. Commonwealth*, 217 Va. 360, 366 (1976)). "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt." *Littlejohn*, 24 Va. App. at 414 (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 567-68 (1995)). The Commonwealth need not "exclude every possible theory or surmise," but it must exclude those hypotheses "which flow from the evidence itself." *Cantrell v. Commonwealth*, 7 Va. App. 269, 289-90 (1988) (citations omitted).

Here, viewing the record in the light most favorable to the Commonwealth, we find the evidence sufficient to support the jury's verdict. The reasonable inference from the facts presented in the Commonwealth's favor was that Coleman suffocated K.A. with a plastic trash bag, then concealed her body and expressed no concern or remorse as her family desperately searched for her.

This inference clearly encompasses the requirement that the Commonwealth prove Coleman acted maliciously. *Branch*, 14 Va. App. at 841 (holding that the existence of malice is a question for the jury). And the other evidence in the record viewed in the light most favorable to the Commonwealth further supports the jury's conclusion.

Moreover, the Commonwealth introduced evidence that Coleman lived in the house with K.A., and at a party on the day before K.A.'s disappearance, Green heard K.A. speaking with Coleman and reluctantly agreeing to comply with his request. The next morning, K.A. was last seen by her mother before 6:00 a.m., and Mwaruwa last spoke to her around 8:00 or 9:00 that morning. Hence, the circumstances of time and place support the Commonwealth's theory of what occurred. *See Oliver v. Commonwealth*, 35 Va. App. 286, 296 (2001) (noting that "circumstantial evidence that is wholly consistent with guilt may prove guilt beyond a reasonable doubt where all the circumstances of time, place, motive, means, opportunity and conduct point to the accused as the perpetrator of the crime").

Coleman also lied several times to law enforcement and others about the circumstances surrounding K.A.'s disappearance. *See, e.g.*, *Ervin*, 57 Va. App. at 515 (holding that a "rejected claim of innocence, when viewed in the light most favorable to the Commonwealth, . . . , 'must be interpreted . . . as [a] mere fabrication[] to conceal his guilt'" (second, third, and fourth alterations in original) (quoting *Staton v. Commonwealth*, 36 Va. App. 282, 289 (2002))). First, Coleman lied about his whereabouts to the police, claiming that he had not left the house when his ankle bracelet proved that he moved from the house to the site in the woods and to the carwash down the street. Coleman further claimed that K.A. had left the house with a boy, but he could provide no details about the person, his car, or the time that K.A. left the house. Thus, as "the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt," *id.* at 516

(quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 10 n.3 (2004)), Coleman's statements further supported the Commonwealth's case.

Finally, the evidence in the record reflects other circumstances that support the Commonwealth's case. For one, the Commonwealth introduced evidence showing that K.A. and Coleman were alone at the house together on the morning she went missing. *See Christian v. Commonwealth*, 221 Va. 1078, 1082 (1981) (holding that "opportunity is always a relevant circumstance . . . and, when reinforced by other incriminating circumstances, may be sufficient to establish criminal agency beyond a reasonable doubt"). DNA evidence also linked Coleman to the crime as he could not be eliminated as a major contributor to the male DNA collected from beneath K.A.'s fingernails. *See* Code § 19.2-270.5 ("In any criminal proceeding, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person."). In addition to the GPS evidence that proved Coleman lied about his whereabouts on the day of the incident, K.A.'s aunt, Rives, testified that she saw Coleman running down the street towards the carwash around the same time the GPS monitor indicated Coleman was not at the home. Even though Coleman claimed that someone had picked up K.A. that morning, her cell phone records suggest that she did not leave the house. *See, e.g.*, *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009) ("The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented.").

Moreover, the record here is bereft of any evidence supporting Coleman's hypothesis that someone else committed the murder, and ample evidence, albeit circumstantial, supports the Commonwealth's hypothesis that Coleman killed K.A. and buried her body in the woods in a shallow grave. We cannot "upend" the jury's finding based upon inferences "unless they are 'so attenuated that they "push 'into the realm of non sequitur.'"'" *Fary v. Commonwealth*, 77 Va. App.

331, 349 (2023) (en banc) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018)). That simply is not the case here. The record fully supports the trial court's denial of Coleman's motions. The Commonwealth's evidence was competent, not inherently incredible, and sufficient to prove beyond a reasonable doubt that Coleman was guilty of second-degree murder. Thus, we hold that the circuit court did err in denying the motions.

## III. CONCLUSION

For the foregoing reasons, we find no error. Therefore, we affirm the trial court's judgment.

*Affirmed.*