Present: Powell, C.J., Kelsey, Chafin, Russell, Mann, and Fulton, JJ., and Mims, S.J.

COMMONWEALTH OF VIRGINIA

v. Record No. 250487

ALSHARRIEF MALIK MAHONEY

OPINION BY
JUSTICE THOMAS P. MANN
JUNE 11, 2026

FROM THE COURT OF APPEALS OF VIRGINIA

A jury found Alsharrief Malik Mahoney guilty of second-degree murder, maliciously

shooting at an occupied vehicle, and use of a firearm in the commission of murder. These

charges stemmed from the 2023 shooting death of Jaleel Tate. Mahoney, who the

Commonwealth concedes did not shoot Tate, was charged as a principal in the second degree;

Tate's shooter was never identified. Before the Court of Appeals, Mahoney argued that the

Commonwealth's evidence was insufficient to prove that he shared the shooter's criminal intent.

The Court of Appeals agreed and vacated his convictions. Because it misapplied the standard of

review and developed its own hypothesis of innocence, we reverse the judgment of the Court of

Appeals and reinstate the judgment of the circuit court.

## I. BACKGROUND

### A. The Fatal Shooting of Jaleel Tate

On May 8, 2023, at 8:21 p.m., a gunman shot Jaleel Tate in the parking lot of the

Panorama Apartments in Roanoke. Tate shared an apartment there with his stepbrother, Jayshon

Hammond, and another man, Rashar Platto.

Minutes before the shooting, at 8:10 p.m., security cameras captured Tate's beige Mazda

626 sedan enter the parking lot and idle in one of the spaces. Tate called his wife, Nakita,[1] in a

_____

[1] Tate and Nakita did not live together.

state of distress. Tate told Nakita that he couldn't "be in this city anymore with Sha." Nakita testified that "Sha" was Platto's nickname, but it was also one of Mahoney's nicknames. Like Tate, Mahoney lived in Roanoke. And though the two had once been close, Tate and Mahoney had not seen or spoken to each other since falling out over a decade earlier. Tate, however, continued to refer to Mahoney as his "brother."[2]

At 8:14 p.m., the Panorama Apartments' security cameras captured Platto's silver BMW sedan exiting the parking lot. At 8:17 p.m., Tate, who was still on the phone with Nakita, moved to a different parking space but remained in the car; his new location was out of direct camera view. At 8:21 p.m., Platto's BMW returned to the parking lot and, also out of direct camera view, parked alongside Tate's car.

Moments after Platto's BMW reentered the lot, a third car—a white Chevrolet Lumina sedan with chipped body paint—trailed in behind it, quickly joining the others out of camera view. Fewer than ten seconds elapsed. Then gunshots rang out.[3] Tate was struck multiple times. Nakita was still on the line.

The shooting was not captured on camera, but another resident, hearing the shots, peered outside her window and observed the gunman. She described a short-statured black man with close-cropped hair, denim jeans, and a white T-shirt holding a handgun.[4] She watched him climb into the Lumina's driver-side door and speed away alone.

---

[2] The two were, in fact, cousins.

[3] The Panorama Apartments' security footage, which does not include sound, captured a woman unloading groceries from her car. At 8:21:51 p.m., she dropped her bags and ran back to retrieve her child from the car, indicating the moment that the shooting likely began.

[4] This description did not match Mahoney, who is taller, and who wore red track pants on the night of the shooting.

At 8:25 p.m., Mahoney made his first appearance on camera: he jogged towards the Panorama Apartments' parking lot, where Tate had just been shot. His arrival at the edge of the parking lot was marked almost immediately by the reappearance of the white Chevrolet Lumina with chipped body paint. Mahoney walked to the Lumina's driver-side door, lingered off-camera for a moment, and then moved around the back of the car towards the front passenger side. Mahoney entered the Lumina, which left the scene for good just before 8:26 p.m. After the shooting, Tate briefly remained conscious. As bystanders began to render aid, one heard Tate say, "[my] brother did it."

Tate was transported to the hospital by first responders but died during emergency surgery. Eleven .40 caliber shell casings were recovered from the crime scene, largely grouped between Tate's and Platto's cars.[5]

During their investigation, police learned that Mahoney's wife owned a white Chevrolet Lumina with identical chipped body paint. Surveillance footage recovered from Mahoney's workplace showed Mahoney driving the Lumina earlier on the day of the shooting.

Mahoney's federal probation officer, Dennis Gardner, testified that three days after the shooting, Mahoney told him he had a new cell phone number. Mahoney did not provide an explanation for the change. Police, in turn, obtained cell data for both of Mahoney's numbers on the night of the shooting. From 8:21 p.m. to 8:26 p.m., both phones pinged the same cell tower covering the Panorama Apartments. This substantially—but not precisely—placed Mahoney in

---

[5] While two handguns were recovered from Platto's car, neither weapon matched the caliber of the shooter's weapon. And although a wad of bloody cash was also recovered from the front seat of Platto's car, Platto told the police on scene that the cash belonged to Tate; another bystander had handed Platto the bills after securing them from Tate's person. Platto, who was twice questioned by police after the shooting, was not charged in connection with the attack.

3

the general area of the shooting.[6]  Cell phone records revealed that Mahoney did not dial 9-1-1 that night.  Police were never able to locate the white Chevrolet Lumina with chipped body paint.  Three days after the shooting, Mahoney arrived to work in a blue Subaru hatchback.  He was arrested shortly thereafter in connection with Tate's killing.

## B.  The Circuit Court

Mahoney was indicted on the following charges:  first-degree murder, maliciously shooting at an occupied vehicle, and use of a firearm in the commission of murder—all under a principal-in-the-second-degree theory of liability.

The case was tried by a jury.  At the conclusion of the Commonwealth's case-in-chief, Mahoney moved to strike the charges.  He argued that the Commonwealth had presented no evidence of the unknown shooter's intent, much less any evidence of Mahoney's shared intent as his principal in the second degree.[7]  The Commonwealth countered that both men's intents were inferable from the circumstantial evidence.  The circuit court denied Mahoney's motion.

Mahoney rested without presenting evidence and renewed his motion to strike.  Relying largely on the same arguments, he added that the Commonwealth had presented no evidence of motive.  The Commonwealth replied that it was not required to prove motive.  The circuit court again denied Mahoney's motion, reasoning, "I do think that a reasonable juror could find either way."

---

[6] The cell data police collected provided a precise measurement of the phones' distance from the cell tower, but the associated GPS coordinates themselves were "low confidence," meaning accurate plus or minus above three hundred meters.  The locations of Mahoney's two phones on the night of the murder were therefore presented to the jury as "arcs" on the map, instead of "GPS pins."

[7] Mahoney did not argue that Tate's shooter had traveled to the Panorama Apartments with the intent to sell Tate drugs or for any other reason than to harm Tate.

4

On the lead charge, the jury found Mahoney guilty of the lesser-included offense of second-degree murder; on the other two, it found him guilty as charged. The circuit court sentenced Mahoney to an aggregate term of 38 years' incarceration with 13 years suspended. Mahoney timely appealed.

## C. The Court of Appeals

In an unpublished opinion, a unanimous panel of the Court of Appeals reversed the judgment of the circuit court and vacated Mahoney's three convictions. *Mahoney v. Commonwealth*, No. 0454-24-3, 2025 Va. App. LEXIS 263 (May 6, 2025). It held that even in the light most favorable to the Commonwealth, the evidence was insufficient to convict Mahoney as a principal in the second degree. *Id.* at *8. "[T]he mere fact that Mahoney allowed another to drive his wife's vehicle," it said, "is insufficient to establish that he did so to assist the shooter in killing Tate." *Id.*

The Court of Appeals analogized this case to *Littlejohn v. Commonwealth*, 24 Va. App. 401 (1997). *Mahoney*, 2025 Va. App. LEXIS 263, at *8. There, on sufficiency grounds, it reversed Littlejohn's convictions as a before-the-fact accessory to five murders committed by her lover, Goins. *Id.* (citing *Littlejohn*, 24 Va. App. at 410). Immediately after the killings, Goins walked a short distance to Littlejohn's waiting car, and Littlejohn drove the pair away. *Id.* (citing *Littlejohn*, 24 Va. App. at 404.) Despite evidence that Littlejohn "harbored animosity" towards one of the victims and twice lied to the police, the court in *Littlejohn* held that there was insufficient evidence to prove that Littlejohn "knew *beforehand*" that Goins intended to commit murder as she waited to drive him away in her car. *Id.* at *9 (emphasis in original) (citing *Littlejohn*, 24 Va. App. at 410). The court in *Littlejohn* stressed that it was just as likely that "something [] occurred in the apartment [that] caused Goins to react spontaneously" as it was

5

that Goins entered the apartment intending to commit mass murder. *Id.* at \*9 (citing *Littlejohn*, 24 Va. App. at 410-11, 413).

Here, the Court of Appeals explained, similar to *Littlejohn*, there was "no evidence that the shooter . . . intended to shoot" his victim when he arrived at the scene. *Id.* at \*9. "Whether [the shooter] went to the apartment complex intending to kill Tate, or whether he killed him as a result of an illicit transaction gone bad," the Court of Appeals said, "was never established." *Id.* This, in turn, undermined the argument that Mahoney's intent had been to facilitate Tate's murder when he lent the shooter his wife's Lumina. *Id.* at \*10. "The gunman was alone when he arrived at the parking lot," the Court of Appeals noted. *Id.* "It is unknown where Mahoney was or what he was doing during the shooting. . . . And, although, not required, there was no evidence of motive . . . ." *Id.* "In sum, the record lacks any evidence that Mahoney lent the Lumina to the shooter for the specific purpose of shooting Tate." *Id.*

The Court of Appeals likewise discounted Tate's statement to his wife before the shooting and his dying declaration. "[T]he record reveals that there was another person at the scene nicknamed 'Sha,'" it said, and "Tate's statement that his 'brother did it'" was "negated by all the evidence that Mahoney was not the gunman." *Id.* at \*10-11.

Finally, the Court of Appeals dismissed the fact that the Lumina was never recovered. It reasoned that even if there had been direct evidence that "Mahoney assisted the shooter in concealing the Lumina from the police," this, too, would still have failed to "demonstrate that Mahoney knew of the shooter's intent beforehand." *Id.* at \*12.

We granted the Commonwealth this appeal.

6

## II. ANALYSIS

### A. Standard of Review

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "Appellate courts are not tasked with 'say[ing] that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt . . . as an original proposition[.]'" *Id.* (quoting *Commonwealth v. Barney*, 302 Va. 84, 97 (2023)). That is for the trier of fact. *Barney*, 302 Va. at 97. "Rather, for an appellate court, '[t]he only "relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Garrick*, 303 Va. at 182 (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). We are thus "required to review the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and to accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence." *Cuffee v. Commonwealth*, 305 Va. __, __, 2026 Va. LEXIS 28, at *11 (2026) (citing *Garrick*, 303 Va. at 182) (emphasis omitted). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).

### B. The Evidence Was Sufficient to Support the Jury's Finding that Mahoney Knowingly Assisted Tate's Killing

"A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010). "A principal in the first degree is

7

the actual perpetrator." *Id.* With few exceptions under Virginia law, [8] "every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18.

"It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008). "This rule cannot be interpreted to mean that any overt act that is advantageous to the principal's criminal plan is sufficient; the defendant must also share in the principal's criminal intent." *Thomas,* 279 Va. at 156-57 (quoting *McMorris v. Commonwealth*, 276 Va. 500, 505-06 (2008)). While "[m]ere presence is not sufficient to convict a defendant as a principal in the second degree," *McMorris*, 276 Va. at 505, the overt act need be no more involved than "keeping watch or guard at some convenient distance." *Brown v. Commonwealth*, 130 Va. 733, 736 (1921).

"[W]hether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence." *Id.* at 737. "Usually, a circumstantial fact, standing alone, 'will be insufficient to establish a basis for a conviction.'" *Commonwealth v. Wilkerson*, 304 Va. 92, 101 (2025) (quoting *Garrick*, 303 Va. at 184). Yet "the combined force of many concurrent and related circumstances may lead a reasonable mind irresistibly to a conclusion." *Id.* Thus, "'an appellate court must consider *all*

---

[8] Exceptions are made for killings for hire, Code § 18.2-31(A)(2); killings pursuant to the direction or order of one who is engaged in a continuing criminal enterprise, Code § 18.2-31(A)(10); and killings pursuant to the direction or order of one who is engaged in the commission or attempt of an act of terrorism, Code § 18.2-31(A)(13). *See* Code § 18.2-18. The principals in the second degree in these cases involving aggravated murder may be convicted only of first-degree murder. *Id.; see also Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005).

the evidence admitted at trial,' and must not view the individual facts in isolation." *Wilkerson*, 304 Va. at 101 (quoting *Garrick*, 303 Va. at 183-84) (emphasis in original). "A conviction may rest on circumstantial evidence alone; in fact, 'in some cases circumstantial evidence may be the only type of evidence which can possibly be produced.'" *Cuffee*, 2026 Va. LEXIS, at *14 (quoting *Garrick*, 303 Va. at 183-84).

Here, viewed in the light most favorable to the Commonwealth, the facts adduced at trial established the following: Tate's killer drove Mahoney's wife's car, which Mahoney had driven to work earlier that same day. The gunman fired on Tate within ten seconds of entering the parking lot; he fled the scene but returned less than three minutes later. Cellular data placed Mahoney at or near the Panorama Apartments during the five or six minutes immediately preceding the shooting, though Mahoney had not seen or spoken to Tate in many years. Security footage captured Mahoney at the edge of the parking lot four minutes after the shooting. When the gunman reappeared at the crime scene, Mahoney approached him, the two conversed, and Mahoney departed as his passenger. As Tate lay dying, he accused his "brother," Tate's moniker for Mahoney; Tate did not accuse Platto, whose car was parked next to his own and who stood feet away with the other bystanders. Contemporaneously with Tate's murder, Mahoney acquired a new cell phone number. Yet on the night of the murder, neither of his numbers dialed 9-1-1. Mahoney's wife's Lumina was never recovered by the police. Three days after Tate's death, Mahoney arrived at work in a blue Subaru hatchback.

Seen through the appropriate appellate lens, a rational trier of fact could have inferred: (i) Mahoney lent the gunman his wife's Lumina for use as a getaway vehicle; (ii) Mahoney kept watch from a safe distance or agreed to rendezvous with the gunman once the job was done; (iii) Tate's initial distress concerning "Sha" was the product of some fresh encounter with Mahoney,

9

not Platto; (iv) Tate's dying declaration that his "brother did it" meant only that Mahoney instigated the shooting, not executed it; and (v) Mahoney disposed of the Lumina afterward to stymie the police investigation. Rather than viewing the evidence in its sum—with proper appellate deference—the Court of Appeals engaged in a piecemeal sufficiency analysis that judged each fact as falling short of the "beyond a reasonable doubt" standard. This was error.

### C. The Evidence Was Sufficient to Exclude All Reasonable Hypotheses of Innocence

As we recently explained in *Cuffee v. Commonwealth*, "'the reasonable-hypothesis principle is not a discrete rule unto itself[,]' but rather, is an attempt to explain the uncontroversial ideas 'that circumstantial evidence must exclude every *reasonable* theory of innocence' and that 'the Commonwealth has the burden of proof beyond a reasonable doubt.'" 2026 Va. LEXIS, at *18 (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 249-50 (2016)) (emphasis in original). "Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Id.*, at *19-20 (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022)).

> [T]he principle recognizes rather than supplants the primary role of the factfinder. If, based on the evidence presented, a jury *reasonably* rejects a proffered hypothesis of innocence, the hypothesis is not a reasonable one. So long as the factfinder's rejection of a proposed hypothesis as unreasonable is not arbitrary, the reasonable hypothesis of innocence principle provides no authority for an appellate court to invade the province of the factfinder.

*Id.*, at *20 (internal citations omitted) (emphasis in original). To that end, "the question for our review on appeal is not whether there was some evidence to support a defendant's hypothesis of innocence . . . . Instead, the pertinent question on appeal is whether a rational factfinder, in light of all the evidence, could have rejected the defendant's theories of innocence and found him guilty beyond a reasonable doubt." *Wilkerson*, 304 Va. at 102 (cleaned up).

Here, the Court of Appeals crafted its own hypothesis of innocence, one never raised by Mahoney at trial: Tate's shooter may have lacked the specific intent to kill Tate when he arrived at the Panorama Apartments. If Tate was killed only "as a result of an illicit transaction gone bad," rather than as the result of a premeditated attack, Mahoney could not have possessed the requisite intent when he lent the gunman his wife's car. This analysis and conclusion, however, are flatly incompatible with the correct appellate standard of review.

The uncontroverted evidence at trial established that the gunman was in the parking lot no more than ten seconds before he began shooting at Tate. The gunman fired his weapon at least eleven times, and he doubled back to the crime scene three minutes later. On these facts, a rational jury could have rejected as implausible the deal-gone-bad theory of innocence and instead concluded that the attack was premeditated. The Court of Appeals' contrary factual framing accords Mahoney favorable inferences to which he is not entitled on appeal and substitutes its own judgment for that of the factfinder. *See Cuffee*, 2026 Va. LEXIS, at *20.

Moreover, *Littlejohn v. Commonwealth* is distinguishable. Monique Littlejohn was convicted as a before-the-fact accessory to the murders of five members of the Jones family, all perpetrated by her lover, Goins. 24 Va. App. at 403-04. Evidence showed that Littlejohn harbored animosity towards the Jones' minor daughter because the minor daughter had a secret, sexual relationship with Goins and was pregnant with his child. *Id.* at 405. Goins, a known cocaine dealer, was socializing at the Jones' residence for roughly "thirty or forty minutes" and likely sold the parents cocaine before he shot and killed everyone in the house except for the minor daughter and an infant child. *Id.* at 404, 407. After the shooting, Goins was spotted getting into Littlejohn's car a few blocks away. *Id.* at 407. Littlejohn lied to the police about driving Goins, and an unused .45 caliber cartridge—matching the caliber of the murder

11

weapon—was later found under her bed. *Id.* at 407-08. The court in *Littlejohn*, however, held that the evidence was insufficient to prove her prior knowledge of Goins' intent to kill the Joneses. *Id.* at 409.

> No evidence proved that Littlejohn was with Goins . . . before [he] went to the apartment. Furthermore, no evidence proved that Littlejohn knew beforehand that Goins intended to kill or shoot the people in the apartment. The fact that Littlejohn had animosity toward [the minor daughter] does not, without more, permit an inference that, before the fact, she contrived, instigated, or advised in Goins' rampage in the apartment. Indeed, no evidence in this record proved that when Goins entered the apartment he did so with the intent to commit murder.

*Id.* at 410-11. "The evidence," the court in *Littlejohn* said, "does not exclude the hypothesis that Littlejohn was waiting for Goins after having agreed merely to meet him at that time and place." *Id.* at 411.

Here, unlike in *Littlejohn*, there was no lengthy social call between Tate and the gunman nor any plausible ten-second business transaction capable of otherwise justifying the gunman's visit to the Panorama Apartments. Likewise, the sheer number of shots fired by the gunman and his swift return to the crime scene both undercut the argument that he reacted defensively to some unspecified act of aggression by Tate and fled in a panic; rather, they speak to premeditation and coordination with Mahoney. For these reasons, *Littlejohn* is inapposite, and the Court of Appeals erred here by reversing Mahoney's convictions, citing *Littlejohn* as "particularly instructive." *Mahoney*, 2025 Va. App. LEXIS 263, at *8. It is not.

### III. CONCLUSION

For the above reasons, we reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court.

*Reversed and final judgment.*